**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SCOTT & WHITE HEALTH PLAN<br>d/b/a Baylor Scott & White Health Plan<br>1206 W. Campus Dr.<br>Temple, TX, 76502<br><br>Plaintiff,<br><br>v.<br><br>XAVIER BECERRA, Secretary<br>United States Department of<br>Health and Human Services<br>200 Independence Avenue, SW<br>Washington, DC 20201 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE**
**RELIEF AND SUMS DUE UNDER THE MEDICARE ACT**

**INTRODUCTION**

1.      Plaintiff, Scott & White Health Plan ("Scott & White" or "the Plan") is a non-profit health maintenance organization ("HMO") that provides, through a contractual arrangement with Defendant's agency, the United States Department of Health and Human Services, services to Medicare program beneficiaries enrolled in the Plan.  As required by the Medicare Act, 42 U.S.C. § 1395 *et seq*., and its implementing regulations, Defendant's agency reimburses Scott & White for its reasonable costs of providing services to Medicare beneficiaries.

2.      To determine reasonable costs of care to the Plan's Medicare patients, Medicare uses statistics to apportion costs.  In a reversal of longstanding practice and guidance, with no advance notice, Defendant's agency changed the method for apportioning costs to the Medicare program for cost years 2012 and 2013, resulting in a retroactive recoupment of nearly $10 million in Medicare reimbursement.  That new apportionment method prohibited cost HMOs from

including statistics relating to physician and supplier services to Medicare beneficiaries that were inadvertently billed to the Medicare contractor instead of the HMO in the ratio used to apportion the Plan's costs.  The agency took this approach notwithstanding the agency's repeated approval of reimbursement (after extensive audits) for HMOs that included these services in the apportionment statistics as far back as 1986 based on a regulation adopted in 1985 to move away from the apportionment methodology that the agency embraces again here.  Scott & White, in the course of planning for and forecasting costs and expenditures for the 2012 and 2013 cost years, had no reason to suspect that the agency would later reject retroactively its previously accepted apportionment method.

3.    Defendant's agency's selective revisions to the apportionment requirements are plainly unlawful as Defendant's agency's own hearing officers concluded both here for the 2012 cost year and in at least two other cases directly addressing this issue.  First, Defendant's agency's late 2013 about-face is contrary to law as it is inconsistent with the controlling regulation and contrary to Medicare cost reimbursement principles established in the Medicare Act and implementing regulations.  The plain language of the apportionment regulation and all indicia of its intent unambiguously require HMOs to include charges for all services furnished to Medicare enrollees in the apportionment ratio regardless of the extent of payment by the plan or whether a Medicare carrier made any payment on those claims.  By selectively excluding the charges for covered services at issue here, Defendant's agency also violates the Medicare Act's reasonable cost provision and its prohibition on cross-subsidization by requiring Scott & White and non-Medicare enrollees to bear the cost for delivering services to Medicare patients.

4.    Second, Defendant's agency's actions are arbitrary, capricious, and not based on substantial evidence.  In its decision, Defendant's agency ignores the plain language of the

regulation requiring inclusion of statistics in the apportionment calculation based on *charges* for covered services, not payments.  Instead, the agency's final decision unreasonably relies on inapposite regulations to support its arguments and fails to acknowledge that the new policy is a change to the agency's decades-long policy and practice regarding treatment of the claims excluded here, which itself engendered reliance interests that Defendant's agency also failed to consider.  The agency's final decision also unreasonably applied the new instructions to the cost years at issue notwithstanding its admission below that it did not apply to those cost years and unreasonably conflated—without support—the distinct concept of charges, costs, and payments. Despite the requirement that reimbursement to HMOs be fair and equitable, the agency's decision unfairly skews the process established in the regulations to determine reasonable cost to reduce reimbursement to HMOs.

5.     Third, the Defendant's agency's actions were not adopted in observance of procedure required by law.  The Medicare Act explicitly requires the agency to go through notice-and-comment rulemaking for the type of action at issue here, as the action established or changed the substantive legal standard governing payment for services provided to Medicare patients.  The statute also prohibits the agency from applying a substantive change in its regulations, policies, or guidelines retroactively to services furnished before the effective date of the change.

6.     Defendant's agency has impermissibly obfuscated the line between determining the overall *costs* that Scott & White incurred and how to *apportion* those costs between Medicare and non-Medicare.  But no amount of misdirection can change what the regulation says: costs are to be apportioned using a ratio of *charges*, not costs or amounts paid by an HMO.  Scott & White, therefore, requests an Order declaring invalid and setting aside the decision of Defendant's agency to remove charges associated with indisputably covered services provided to Medicare enrollees

from Scott & White's apportionment statistics for the 2012 and 2013 cost years at issue. Scott & White further requests an Order remanding the case to Defendant's agency's hearing officer for proceedings consistent with the Court's decision, including the correction of the underpayments and litigation interest, as well as any additional relief the Court may consider necessary or appropriate.

## JURISDICTION AND VENUE

7.      This action arises under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

8.      Jurisdiction is proper under 28 U.S.C. § 1331, 28 U.S.C. § 1361, and 42 U.S.C. § 1395oo(f)(1).

9.      Venue is proper in this judicial district under 28 U.S.C. § 1391, 42 U.S.C. § 1395oo(f)(1), and 42 C.F.R. § 405.1877(e)(1).

## PARTIES

10.     Plaintiff, Scott & White Health Plan d/b/a Baylor Scott & White Health Plan, is a non-profit HMO that operates in Texas, with its principal place of business at 1206 W. Campus Drive, Temple, TX 76502. Founded in 1982 and currently covering nearly 400,000 members, Scott & White participates in the Medicare program as a cost-reimbursed HMO. Its Medicare program identification number is H-4564.

11.     Defendant, Xavier Becerra, is sued only in his official capacity as Secretary of the United States Department of Health and Human Services ("Secretary"), the federal agency that administers the Medicare program. References in this Complaint to the Secretary are meant to refer to him, his subordinate agencies and officials, and to his official predecessors or successors as the context requires.

12.     The Centers for Medicare & Medicaid Services ("CMS") is a component of the Secretary's agency with responsibility for day-to-day operation and administration of the Medicare program.  References in this Complaint to CMS or the agency are meant to refer to CMS and its predecessors, including the Health Care Financing Administration, as the context requires.

## STATUTORY AND REGULATORY BACKGROUND

### The Medicare Program and Managed Care

13.     The Medicare program provides health insurance for aged and disabled individuals under Title XVIII of the Social Security Act ("SSA"), the Medicare Act.  42 U.S.C. § 1395 *et seq.* Part A of the Medicare Act covers "the costs of hospital, related post-hospital, home health services, and hospice care."  42 U.S.C. § 1395c.  Part B of the Medicare Act covers "medical and other health services," including physicians' services and supplies, among other things.  *Id.* §§ 1395k(a)(2)(B), 1395x(s).  Under the traditional Medicare Part B fee-for-service program, Medicare reimburses physicians and suppliers directly for covered services furnished to Medicare beneficiaries.  *See id.* § 1395*l*; *Am. Soc'y of Cataract & Refractive Surgery v. Thompson*, 279 F.3d 447 (7th Cir. 2002).  Those fee-for-service claims and payments are processed by Medicare administrative contractors generally referred to as "carriers."  *See* 42 U.S.C. § 1395u.

14.     The Medicare Act also establishes two managed care alternatives to the traditional fee-for-service program.  Since the 1970s, the Medicare Act, specifically section 1876 of the SSA (42 U.S.C. § 1395mm), has authorized the Secretary to contract with health maintenance organizations to provide or arrange for the provision of Medicare-covered services directly or through contractual arrangements with institutional "providers" (such as hospitals and skilled nursing facilities), physicians, and suppliers.  *See id.* § 1395mm.

15.     Congress enacted the other Medicare managed care program as Part C of the Medicare Act, called Medicare Advantage, in 1997.  *See id.* § 1395w-21.  Medicare Advantage

generally superseded the original managed care program under section 1876 of the SSA (42 U.S.C. § 1395mm) and is far more prevalent today; when Congress enacted the Medicare Advantage program, it precluded the Secretary from entering into new cost reimbursement contracts, but allowed (subject to certain conditions) the extension or renewal of existing contracts. *See id.* § 1395mm(h)(5)(A).

*Medicare Cost Reimbursement for HMOs Under Section 1876*

16.     Under section 1876, the Secretary reimburses HMOs, including Scott & White, on a "reasonable cost" basis. *Id.* § 1395mm(h). The Medicare Act defines "reasonable cost" to include the direct and indirect costs actually incurred, as determined under regulations specifying the items included and methods used to determine reasonable cost. *See id.* §§ 1395mm(h)(1), 1395x(v)(1)(A). The Medicare Act requires that "under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs . . . ." *Id.* § 1395x(v)(1)(A). The regulation confirms that the "purpose of apportionment is to ensure that—(1) [t]he cost of services furnished to Medicare enrollees is not borne by other enrollees and nonenrolled patients; and (2) [t]he cost of the services furnished to other enrollees and nonenrolled patients is not borne by Medicare." 42 C.F.R. § 417.552(b).

17.     The regulations in Part 417, added by final rule in 1985, require an HMO to make available to its Medicare enrollees the Medicare benefits that are covered under the Medicare Act. *Id.* § 417.414(b); *see also* 50 Fed. Reg. 1,314, 1,346 (Jan. 10, 1985). An HMO may satisfy this obligation by furnishing services to its Medicare enrollees either "directly or through arrangements with others." 42 C.F.R. § 417.414(b); *see also* 50 Fed. Reg. at 1,346. Except as otherwise provided in Part 417, reasonable cost is determined under the Medicare reasonable cost

reimbursement regulations codified in 42 C.F.R. Part 413. *See* 42 C.F.R. §§ 417.534, 417.536. The regulations in 42 C.F.R. Part 413 make clear that Medicare cost reimbursement principles are intended to produce "fair and equitable reimbursement for services" furnished to Medicare beneficiaries. *Id.* § 413.5(a).

18.     During the course of a particular cost year, "CMS makes monthly advance payments equivalent to the HMO's or CMP's interim per capita rate for each beneficiary who is registered in CMS records as a Medicare enrollee of the HMO or CMP." *Id.* § 417.570(a)(1). The "interim per capita rate is determined annually by CMS on the basis of the HMO's or CMP's annual operating and enrollment forecast . . . ." *Id.* § 417.570(b). That budget and enrollment forecast is submitted annually for the upcoming cost year "at least 90 days before the beginning of each contract period." *Id.* § 417.572(a). For example, the budget forecast for an HMO whose cost year begins January 1, 2013, would be due October 3, 2012. The forecast requires detailed information from the HMOs and must be "based on financial and statistical data and records . . . [that] include, but are not limited to, all ledgers, books, records, and original evidence of costs, and statistical data used in the determination of reasonable cost." *Id.*

19.     Within 180 days of the end of each cost year, the HMO must submit a cost report for that cost year to CMS, which CMS uses to make retroactive adjustments to bring the advanced payments "into agreement with the payable amount due the HMO or CMP." *See* 42 U.S.C. § 1395mm(h)(3)–(4); 42 C.F.R. § 417.576(b)(1), (c)(1). A cost report must contain two key elements: (1) "[t]he per capita costs incurred in furnishing covered services to its Medicare enrollees"; and (2) "[t]he HMO's or CMP's methods of apportioning cost among Medicare enrollees, and nonenrolled patients" in accordance with the regulations governing reasonable cost reimbursement. 42 C.F.R. § 417.576(b)(2). CMS, which itself acts as the direct "fiscal

intermediary" for the HMO, reviews each HMO cost report and issues a Notice of Program Reimbursement ("NPR") containing a final payment determination that reconciles the estimated interim program payments made to the HMO over the course of the cost year with its allowable total reasonable cost for the year. *See id.* §§ 417.532(b), 417.570, 417.576.

20.    In the 1985 revisions to the regulations, the Secretary adopted a new apportionment regulation codified at 42 C.F.R. §§ 417.552–.566. *See* 50 Fed. Reg. at 1,346. The governing regulation here, section 417.560(c), specifically adopted an apportionment methodology based on charges for covered services, not the payments made for those services. Prior to the adoption of this regulation, HMOs could calculate their apportionment statistics based on the net amount actually paid for the physician and supplier services provided. A former CMS official responsible for oversight of cost-reimbursement plans stated that the reason for the change was the agency's concern that the previously used claims-apportionment method, through which Medicare reimbursed plans based on the amounts that plans spent to provide services to Medicare enrollees, was susceptible to gaming by some cost-reimbursement HMOs.

21.    Notably, the regulations prescribe different methods for apportionment for "provider services furnished by the HMO or CMP through arrangements with others," and for "Part B physician and supplier services." *Compare* 42 C.F.R. § 417.556, *with* 42 C.F.R. § 417.560. The Medicare Act defines "supplier" as "a physician or other practitioner, a facility, or other entity (other than a provider of services) that furnishes items or services under this subchapter" and defines "provider of services" as an institutional provider, including "a hospital, critical access hospital, rural emergency hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency" or funds of certain teaching hospitals or hospitals affiliated with medical schools. 42 U.S.C. § 1395x(d), (u). The regulations' definitions of "supplier" and

"provider" largely adopt the definitions laid out in the statute while adding a few categories to the definition of "provider."  *See* 42 C.F.R. § 400.202.  The apportionment regulations apply to cost years beginning after 1985, including the two cost years at issue.

22.    Under section 417.556, governing provider services, the Medicare share of the cost of covered services furnished to Medicare enrollees "must be based on the cost the HMO or CMP pays the provider under their arrangement . . . ."  *Id.* § 417.556(a).  Under section 417.560, governing the Part B physician and supplier services at issue in this case, reasonable costs are determined by apportioning a plan's overall costs between Medicare and non-Medicare enrollees. *Id.* § 417.560.

23.    Section 417.560(c), relevant here, provides that when an HMO or CMP arranges with physicians and suppliers to provide services on a fee-for-service basis, the Medicare share of the cost of the physician and supplier services furnished to Medicare enrollees "is determined by multiplying the total amount for all such services by the ratio of charges for covered services furnished to Medicare enrollees to the total charges for all such services."  *Id.* § 417.560(c).

24.    Section 417.560(c) thus prescribes the applicable apportionment calculation when an HMO provides covered services under contractual arrangements with physicians and suppliers providing for payment by an HMO to them on a fee-for-service basis.  The calculation is based on a ratio comparing (1) the utilization of covered services furnished to the HMO's Medicare enrollees (the numerator), with (2) the total covered services furnished to all of the HMO's enrollees (the denominator).  This Court recently explained this process:

> Under this approach, a cost-reimbursed [plan] calculates the sum for which Medicare is responsible by first identifying the total cost of all services, which includes both:  (1) the direct costs associated with furnishing services to Medicare *and* non-Medicare enrollees, *and* (2) certain indirect costs such as enrollment and operations costs.  That sum is then multiplied by the ratio of charges for covered services furnished to Medicare enrollees relative to the total charges for all covered

> services.  The product of that calculation results in the [plan's] reimbursable "costs
> actually incurred."

*Rocky Mountain Health Maint. Org., Inc. v. Azar*, 384 F. Supp. 3d 80, 84 (D.D.C. 2019) (citations

omitted).

25.     Section 417.560(c) bases apportionment entirely on the ratio of charges for services

and does not contain any conditions, exceptions, or exclusions on the charges that are included in

the apportionment ratio.  42 C.F.R. § 417.560(c).  Unlike section 417.556, section 417.560

contains no requirement that the Medicare share be "based on the cost the HMO or CMP pays the

provider."  *Compare* 42 C.F.R. § 417.556(a), *with* 42 C.F.R. § 417.560(c).

26.     Apportionment statistics and other similar estimates are used under Medicare

reasonable cost regulations as a statistical proxy formula for purposes of determining the Medicare

program's share of an organization's total costs.  *See Charter Peachford Hosp., Inc. v. Bowen*, 803

F.2d 1541, 1547 (11th Cir. 1986) (explaining that Medicare reasonable cost principles employ an

"averaging technique" and inconsistent treatment of statistics used in these proxies "would destroy

the balance upon which the regulatory averaging principle depends . . .").  As the agency's hearing

officers have found with respect to the regulation at issue in this case:

> The formula often involves taking a defined set of costs the organization incurs and
> multiplying it against a statistical ratio that represents the Medicare program's share
> of utilization (numerator) out of a larger set of the organization total utilization
> (denominator).  A statistical proxy, by nature, will never achieve an exactly precise
> measurement.  Moreover, the measurement of utilization and/or indirect costs, by
> nature, is not an exact science.

27.     The apportioned costs are drawn from a plan's cost report.  To assist plans with the

completion of cost reports, CMS publishes a set of materials on how to complete the cost report.

*See, e.g., CMS Form Number: CMS-276*, Ctrs. for Medicare & Medicaid Servs. (Jan. 18, 2022),

*available at* https://www.cms.gov/Regulations-and-Guidance/Legislation/PaperworkReduction

Actof1995/PRA-Listing-Items/CMS-276 (current version of Form CMS-276 effective as of Jan. 18, 2022).  The publicly available materials contain cost report and budget forecast worksheets as well as the cost report instructions excerpted from the Provider Reimbursement Manual ("PRM") for how to complete those worksheets.  *Id.*; *see also* PRM – Part 2 § 2306, CMS Pub. No. 15-2, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021935 (last visited Oct. 10, 2022) (current cost report instructions).  The cost report instructions in effect for the cost years at issue, included in the administrative record for this case, direct plans to include on the appropriate line on Worksheet E "the cost of services incurred by the plan" for services furnished by physicians, suppliers and others.  These service costs are reported on lines 7–23 of that Worksheet.  Those costs, following certain adjustments and reclassifications, are apportioned among Medicare and other plan enrollees on cost report Worksheet K, using the apportionment statistics reported on Worksheet D.  The instructions for Worksheet D in effect for the cost years at issue here provide that the apportionment ratio compares "the number of days or statistical units used by Medicare enrollees for which Medicare has primary liability" with the "days or statistical units that are covered by the Medicare program."

28.    CMS's audit protocols provide further insight into the proper inclusion of services in the ratio.  The audit protocols define "covered charges" as "services or benefits for which the charge is eligible towards satisfying a patient deductible or out of pocket maximum and/or results in the health plan making either partial or full payment."  Joint Appendix at 420, *Rocky Mountain*, 384 F. Supp. 3d 80 (No. 1:17-cv-00242), ECF No. 20 ("Agreed Upon Procedures").  The proper composition of the apportionment statistics on Worksheet D (utilized on Worksheet K) is at issue here.

29.     As the hearing officer in this case recognized, in the normal course of business, the physician is expected to bill a plan for the cost of that service, but, on occasion, the physician sends the bill to a Medicare contractor, also called a "carrier," rather than the plan, and the "carrier then remits payment to the physician and the Plan pays a 'residual amount.' These payment transactions are called 'carrier-paid claims.'" *Scott And White Health Plan v. Ctrs. for Medicare & Medicaid Servs.*, Hearing Officer Case No. HMO 2020-03 at 2–3 (Aug. 1, 2022) ("Hearing Officer Decision") (citations omitted).

30.     Until the 2014 cost year, CMS's longstanding policy under the regulations and the instructions described above was to accept the inclusion of these carrier-paid claims in plans' apportionment statistics. *See Rocky Mountain,* 384 F. Supp. 3d at 85 (Until CMS "broke its silence in 2013," the agency "had never objected to [the plan's] inclusion of carrier-paid claims in its cost reports.").

31.     In late summer 2013, CMS changed its cost report instructions to require plans to exclude charges associated with carrier-paid claims from their Worksheet D apportionment statistics. *See* PRM – Part 2 § 2306, CMS Pub. No. 15-2 (current cost report instructions stating: "[F]or the completion of [Worksheet D], Medicare statistics should exclude any claims processed by MACs for services provided to Plan enrollees."). In an email transmitting the revised instructions to HMOs, CMS informed the HMOs that the new forms and instructions were "to be used beginning with the 2014 Budget Forecast" for cost years after 2012 and 2013 cost years at issue here.

32.     CMS also later issued an instruction in its "Program for Uniform Examination Procedures for Medicare Cost Organizations" that an auditor should:

> Obtain support for statistics reported on worksheet D. Verify that the statistics used are appropriate to allocate Medicare and Non Medicare costs. For example, Plans

should not include statistics for claims paid by the Medicare carrier/intermediary/MAC in Plans' Medicare statistics, as this would result in overstated Medicare apportionment ratio.

***Administrative Appeal of Notice of Program Reimbursement***

33.    The regulations governing HMOs specifically provide for a "right to a hearing in accordance with the requirements specified in § 405.1801(b)(2) of this chapter."   42 C.F.R. § 417.576(d)(4).   Section 405.1801(b)(2) provides nonprovider entities, including HMOs, that wish to challenge their final payment determination the right to "some other hearing . . . if the amount in controversy is at least $1,000." *Id.* § 405.1801(b)(2)(iii).  These hearings are subject to the procedural rules for hearings before the Provider Reimbursement Review Board ("PRRB") "to the maximum extent possible," under 42 C.F.R. Part 405, subpart R. *Id.* § 405.1801(b)(2)(iv).

34.    Once an NPR has been issued, a cost plan must appeal that determination within 180 days. *Id.* § 405.1835(a)(3).   "CMS Hearing Officers conduct the 'some other hearing'" provided by section 405.1801(b)(2)(iii) for these appeals. *Rocky Mountain*, 384 F. Supp. 3d at 85. Under these regulations, the hearing officer "must comply with all the provisions of Title XVIII of the Act and regulations issued thereunder, as well as CMS Rulings issued under the authority of the Administrator . . . ."  42 C.F.R. § 405.1867.   The hearing officer also "shall afford great weight to interpretive rules, general statements of policy, and rules of agency organization, procedure, or practice established by CMS." *Id.*

35.    Once the hearing officer issues a decision, that decision is final and subject to judicial review unless it is "reversed, affirmed, modified, or remanded by the Administrator under §§ 405.1875(e) and 405.1875(f) of this subpart within 60 days of the date of receipt" of that decision. *Id.* § 405.1877(a)(3)(ii).  Under section 405.1875, CMS, or a party to the initial appeal, may request review of the hearing officer's decision by the CMS Administrator within fifteen days

of receiving the hearing officer's decision.  *Id.* § 405.1875(c)(1)(i)–(ii).  The CMS Administrator

may also decide to review a hearing officer's decision on her own motion.  *Id.* § 405.1875(c)(3)(i).

36.    If the Administrator accepts review of the hearing officer's decision, the

Administrator must issue a decision within 60 days of the date on which a cost plan received the

hearing officer's decision.  *Id.* § 405.1875(e)(2).  Unless the Administrator's decision remands the

matter to the hearing officer for further proceedings, the Administrator's timely decision is final

and binding on the parties.  *Id.* § 405.1875(e)(4).  "If the Administrator timely reverses, affirms,

or modifies" the hearing officer's decision, "the Administrator's reversal, affirmation, or

modification is the only decision subject to judicial review . . . ."  *Id.* § 405.1877(a)(4).  A civil

action requesting judicial review of the Administrator's decision must be filed "no later than 60

days after the date of receipt by the provider of the Administrator's decision . . . ."  *Id.*

§ 405.1877(b)(3)(i).

## FACTS SPECIFIC TO THIS CASE

### The Plan and Its Services

37.    Scott & White is a non-profit HMO that has furnished health services directly to

subscribers through its affiliated hospitals and its staff network of physicians, laboratories, and

suppliers since 1982.  At issue here, Scott & White also provides services indirectly through

contractual agreements with outside physicians, hospitals, pharmacies, and others.  Scott &

White's membership currently consists of nearly 400,000 members with service in 171 counties

throughout Texas.  *See About Us*, Baylor Scott & White Health Plan,

https://www.bswhealthplan.com/pages/about.aspx (last visited Oct. 10, 2022).  Scott & White

offers individual and family plans, fully insured and self-funded plans for small and large

employers, Medicare Advantage and Prescription Drug plans, and a Medicaid plan.

38.     Scott & White has a cost contract with CMS for the provision of services to Medicare beneficiaries.  Under its contract with CMS, the Plan was entitled to Medicare program reimbursement for the reasonable costs of services provided directly or under arrangements with others, as determined under section 1861(v) of the SSA.  *See* 42 U.S.C. § 1395mm(a)(2), (h)(1)–(3).  The issue in this case concerns only the reasonable cost of medical and other health services, covered under Part B of the Medicare Act, that Scott & White arranged to furnish to its Medicare enrollees.

39.     Under agreements with outside physicians, hospitals, pharmacies, suppliers, and others, Scott & White pays for services on a fee-for-service basis.  Scott & White pays the contracted party based on a fee schedule net of any cost sharing that is the member's responsibility under the terms of the Plan's coverage contracts.  Those fee schedules are established prior to the start of a cost year.

40.     The Plan's agreements with outside parties require them to bill the Plan for covered services furnished to Plan subscribers.  Nevertheless, outside parties sometimes bill the Medicare Part B carrier for services furnished to Medicare Part B enrollees who are covered by the Plan.  In those cases, the Medicare carrier will pay the party under the Medicare Part B fee schedule, and the Plan will pay a residual amount in addition to costs incurred in the administration and processing of these claims.

41.     Scott & White submitted its cost report for the cost year ending December 31, 2012, on July 30, 2013, and its cost report for the cost year ending December 31, 2013, on June 30, 2014.  In preparing the cost reports, in accordance with the cost report instructions, Scott & White only included on Worksheet E (Calculation of Reimbursement Settlement) the costs it incurred for

providing covered services and did not include any payments made by Medicare carriers on Worksheet E.

42.    In preparing the 2012 and 2013 cost reports, the Plan engaged in discussions with CMS noting that it would include all covered claims including carrier-paid claims in its apportionment statistics (Worksheet D, Cost Apportionment) and received an email from a CMS auditor requesting the Plan "prepare your cost report as noted in the future," which the Plan understood as confirmation that it could proceed in the manner disallowed here.

***Final Determination Appealed Below***

43.    CMS, acting through its Office of Financial Management, Financial Services Group, Division of Financial Audit and Resolution, issued a final determination as to the amount of program reimbursement due the Plan for its 2012 and 2013 cost years in a single NPR dated August 7, 2019.  The adjustments removed carrier-paid claims from the Plan's apportionment statistics on Worksheet D, which were then carried forward into the Plan's apportionment ratio, as calculated on Worksheet K.  These adjustments were originally proposed by CMS's audit contractor, Bland & Associates, that apparently relied on the revised version of the cost report instructions that did not take effect until the 2014 cost year cycle (starting with and reflecting the 2014 Budget Forecast), *after* the 2012 and 2013 cost years at issue here.

44.    These adjustments reflect an about-face in agency policy and practice: CMS, in contravention of regulations, no longer allowed inclusion of all charges in the apportionment ratio. The Plan is appealing CMS's adjustments to its apportionment statistics for both the 2012 and 2013 cost years.  The amounts in controversy are $4,507,393 for 2012 and $5,070,813 for 2013, reflecting a total retroactive claw back of $9,578,206 for these two cost years.

45. Due to the retroactive application of the new cost report instructions, the requirement that Scott & White's budget forecast be submitted 90 days before the start of the cost year, and the fact that Scott & White necessarily must contract with physicians and suppliers even before that point, Scott & White had no opportunity to mitigate the losses resulting from this changed instruction.

**Administrative Appeal Proceedings**

46. Because the yearly amounts in controversy exceed $1,000, the Plan is entitled to appeal the final payment determination to a CMS hearing officer. *See* 42 C.F.R. §§ 405.1801(b)(2), 417.576(d)(4). On January 24, 2020, Scott & White timely appealed CMS's payment determination adjusting Scott & White's apportionment statistics for the 2012 and 2013 cost years to CMS hearing officers employed by the Secretary to adjudicate cost-reimbursement appeals by HMOs. *Id.* §§ 417.576(d)(4), 405.1801(b)(2). The appeal was assigned case number HMO 2020-03. *See* Hearing Officer Decision. The decision in that appeal is the decision at issue here.

47. After a hearing on the record, the hearing officer issued a decision, dated August 1, 2022, (1) reversing CMS's adjustments to remove the Medicare-covered services for which a claim was processed by a Medicare carrier from Scott & White's service apportionment statistics for the 2012 cost year, and (2) upholding CMS's adjustments to remove these services from the apportionment statistics for the 2013 cost year.

48. With respect to the 2012 cost year, the hearing officer ruled that CMS's determination to remove Medicare-covered services from the apportionment statistics conflicts with the plain language of the apportionment regulation in 42 C.F.R. § 417.560(c). Hearing Officer Decision at 11–12. The hearing officer reached the same conclusion that it had in at least two prior cases addressing this same issue with respect to two other HMOs: that the literal terms

of the apportionment regulation include carrier-paid claims in the calculation of the apportionment ratio. *Id.* The hearing officer, therefore, "concur[red] with and adopt[ed]" the analysis of the apportionment regulation from the *Rocky Mountain* Hearing Officer Decision and "overturn[ed] the appealed CMS adjustments for cost reporting year 2012." *Id.* at 12.

49.    This conclusion that the plain language of the lawfully promulgated regulation should have ended the analysis and resulted in the hearing officer overturning CMS's adjustments for the 2013 cost year as well. However, the hearing officer improperly decided to rely on additional "sub-regulatory guidance" in the form of a memorandum issued by CMS in late 2013 ("2013 Memorandum") that purported to transmit new, binding cost report instructions for HMOs, requiring that "**Medicare** statistics should exclude any claims processed by MAC[s], Carriers, and Intermediaries." *Id.* at 14–17.

50.    The hearing officer concluded that August 12, 2013, (*i.e.*, the date on which the 2013 Memorandum was sent to the HMOs) therefore "represent[ed] the effective date on which CMS published its policy regarding carrier-paid claims, in the form of the 2013 Cost Report Instruction." *Id.* at 17. As such, the hearing officer afforded "great weight" to this "statement[] of agency policy" and found that Scott & White was "on notice regarding CMS'[s] policy that carrier-paid claims . . . were to be excluded from the Cost Report Worksheet D Medicare Statistics as of August 12, 2013." *Id.* While the hearing officer found this instruction did not apply to Scott & White's 2012 cost report because that cost report was filed before the issuance of the 2013 Memorandum, the hearing officer found the instruction controlling on Scott & White's 2013 cost report, which was submitted on June 30, 2014, after the effective date of the instruction. *Id.* Thus, the hearing officer upheld CMS's adjustments to the apportionment statistics for the 2013 cost year. *Id.* at 18.

51.     The hearing officer also improperly rejected or otherwise failed to consider Scott & White's arguments that the new policy to exclude carrier-paid claims could not be applied to the 2013 cost year.  The hearing officer determined that Scott & White's argument that the changed policy was invalid under the Medicare Act's notice-and-comment requirements was "beyond the Hearing Officer's scope of authority."  *Id.* at 12–14.  The hearing officer also determined that the effective date of the changed policy was August 12, 2013, and applied the changed policy to the entire 2013 cost year despite ***both*** CMS and Scott & White submitting statements to the hearing officer agreeing that "Plans were required to use the new forms"—that is, the forms that accompanied the transmission of the 2013 Memorandum with the changed policy—"starting with their FY 2014 cost year."  *Id.* at 14–16.

52.     Furthermore, the hearing officer created an internal inconsistency in its treatment of the excluded claims, appropriately using the plain language to find that carrier-paid claims are included in apportionment statistics for the 2012 cost year, but using "sub-regulatory guidance" to override that plain language and require exclusion of the claims for the 2013 cost year.  The hearing officer also failed to address (i) the showing that CMS had a longstanding policy and practice of permitting inclusion of the claims at issue here in the apportionment statistics; (ii) that the new policy violated notice-and-comment requirements (other than to state that the hearing officer lacked authority to consider these arguments) and was impermissibly being applied retroactively to services rendered before the effective date of that policy; (iii) that the policy selectively eliminated only some covered services from the apportionment statistics, thereby distorting the averaging principle on which apportionment depends and violating the Medicare Act's prohibition on cross-subsidization; and (iv) that the changed policy did not account for HMOs' reliance interests before retroactively rescinding tens of millions of dollars from HMOs.

53.     On August 8, 2022, the Administrator, on her own motion, informed Scott & White and CMS that she would review the hearing officer's decision.  Jonathan Blum, the Principal Deputy Administrator of CMS, issued the decision of the Administrator on September 30, 2022.

54.     The Deputy Administrator disagreed with the hearing officer's findings and modified the hearing officer's decision.  *Scott and White Health Plan v. Ctrs. for Medicare & Medicaid Servs.*, CMS Administrator, Review of CMS Hearing Officer Case No. HMO 2020-03 (Sept. 30, 2022) ("Administrator Decision").  The Administrator instead determined that the CMS auditor's findings and initial adjustments were correct and reinstated those adjustments.  *Id.* at 14.

55.     Rather than follow the plain text of the duly enacted regulations, the Deputy Administrator instead seeks to blur the line between calculation of costs and apportionment of those costs based on charges.  The Deputy Administrator fails to address the apportionment regulation that is controlling here, 42 C.F.R. § 417.560(c), in any meaningful way.  Instead, the Deputy Administrator asserts—without any support—that that if Medicare "directly incurs" the costs by paying those claims (through the carriers), then those claims cannot be included in the apportionment calculation because doing so "would amount to inappropriate cost shifting."  *Id.* at 15.  More starkly, this assertion ignores Scott & White's arguments that in fact the opposite is true: by selectively removing the charges from the apportionment statistics, CMS itself is distorting the apportionment ratio and thus violating the Medicare Act's violation against cross-subsidization.  *See* 42 U.S.C. § 1395x(v)(1)(A).  Indeed, the Deputy Administrator seems to admit as much by stating that "the Plan may have incurred unidentified costs related to the arrangement of these services, which is not captured if the non-paid service is not included in the statistic[s]."  Administrator Decision at 17.

56.     The Deputy Administrator also relies on an inapposite regulation, 42 C.F.R. § 417.556.  *Id.* at 15.  The Deputy Administrator invokes this regulation—which addresses apportionment of a different category of costs for institutional "provider" services not at issue here—as requiring a connection between the Medicare share of the cost and the amount the HMO pays to the provider.  Despite the fact that the governing regulation, section 417.560(c), specifically states the ratio is based on charges for covered services, not the payments made by the HMO, the Deputy Administrator argues that including services results in Medicare making excess payments to the HMO.  *Id.*

57.     Puzzlingly, the Administrator, apparently for the first time and without any support, also asserts that CMS also had a "longstanding practice of removing carrier paid claims from the apportionment ratio," which practice was "clarified" in the revised 2013 Cost Report Instructions. *Id.* at 18.

## COUNT I
### (Judicial Review of Agency's Final Determination)

58.     Plaintiff repeats the allegations in paragraphs 1 through 57 of this Complaint as if fully set forth herein.

59.     The Administrative Procedure Act provides that the "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence[.]"  5 U.S.C. § 706(2).  CMS's determination to remove Medicare-covered services from Scott & White's apportionment statistics should be set aside for all of those reasons, including the ones detailed below.

60.     CMS's determination to remove certain Medicare-covered services from Scott & White's apportionment statistics should be set aside, because it is contrary to law.  In particular, the determination conflicts with the plain language of the controlling regulation in 42 C.F.R. § 417.560(c) and is inconsistent with other indications of intent in the regulation.  *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (A court may not accept an agency's interpretation of a rule that is contrary to "the regulation's plain language or [to] other indications of the Secretary's intent at the time of the regulation's promulgation."); *see also Kaiser Found. Hosps. v. Sebelius*, 708 F.3d 226, 231 (D.C. Cir. 2013) (declining to consider agency's interpretation of regulation as inconsistent with the plain language of the regulation), *superseded by subsequent regulation*, 42 C.F.R. § 405.1885; *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000) (rejecting agency effort to "overcome the regulation's obvious meaning").

61.     The plain language of the controlling regulation here unambiguously requires the use of an apportionment ratio that includes all "charges for covered services furnished to Medicare enrollees," without any exception or carve-out based on the extent of the costs that Plan incurred for these indisputably covered services.  *Rocky Mountain*, 384 F. Supp 3d at 86.  Thrice now the agency's own expert hearing officers have agreed that apportionment is based on charges, not costs, concluding that "[t]he term covered services" in the apportionment regulation "includes carrier paid claims" and "the literal text of 42 C.F.R. § 417.560(c) provides that carrier-paid claims are included within the apportionment ratio."  Hearing Officer Decision at 11–12; *see also Rocky Mountain Health Maint. Org., Inc. v. Ctrs. for Medicare & Medicaid Servs.*, Hearing Officer Case No. HMO 2014-2 at 6, 10 (Sept. 22, 2016); *Medica Ins. Co. v. Ctrs. for Medicare & Medicaid Servs.*, Hearing Officer Dkt. No. H-2020-02 at 11–13 (Jan. 28, 2022).

22

62.     This plain reading of the regulation is also consistent with other indications of the Secretary's intent when the agency adopted section 417.560, including the agency's interpretation of the regulation in the Medicare Managed Care Manual, the agency's controlling cost report instructions for the years at issue, the agency's own requirements for HMO cost report audits as defined in the Agreed Upon Procedures, the agency's change to the apportionment methodology in 1985 to prohibit use of a paid-claims apportionment method, and the agency's past practice in accepting apportionment statistics from HMOs that included the claims disallowed here.

63.     CMS's selective elimination of the charges for some covered services, but not others, also violates the Medicare Act's prohibition on cross-subsidization contained in the statutory definition of reasonable cost by distorting the balance of the averaging principle on which Medicare cost finding and cost apportionment principles must depend, and yields unfair reimbursement to the Plan.  42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 417.552(b).  The Deputy Administrator admits as much in the Administrator Decision, stating that "CMS recognizes the Plan may have incurred unidentified costs related to the arrangement of these services, which is not captured if the non-paid service is not included in the [apportionment] statistic[s]." Administrator Decision at 17.

64.     Furthermore, the Administrator's unreasonable decision to uphold the CMS auditor's selective decision to remove certain covered claims from the Plan's apportionment statistics must be set aside because it is arbitrary and capricious and not supported by substantial evidence.  *See* 5 U.S.C. §706(2)(C), (E).  Under the arbitrary and capricious standard, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted).  An agency's

failure to consider an important aspect of the problem and unexplained inconsistencies in agency

decisions are hallmarks of arbitrary and capricious reasoning. *Util. Solid Waste Activities Grp. v.*

*EPA*, 901 F.3d 414, 430 (D.C. Cir. 2018); *see also Transactive Corp. v. United States*, 91 F.3d

232, 237 (D.C. Cir. 1996) ("A long line of precedent has established that an agency action is

arbitrary when the agency offered insufficient reasons for treating similar situations differently.");

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 856 (5th Cir. 2022) ("The [agency's

action] thus has 'an unexplained inconsistency'—the hallmark of an arbitrary and capricious

change from agency practice.") (quotation omitted). Agency action has been found to be arbitrary

and capricious when the agency has changed position without acknowledging the change and

showing good reason for the change, when the agency has failed to consider "serious reliance

interests" engendered by a prior longstanding policy. *See Encino Motorcars, LLC v. Navarro*, 579

U.S. 211, 221–22 (2016). An agency's action is also arbitrary and capricious when "the agency

has relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or is so implausible that it could not be ascribed to a difference in

view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

65.     In addition, under the Administrative Procedure Act's ("APA") "substantial

evidence" standard, an agency determination must be supported by "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *United States v. Fed. Mar.*

*Comm'n*, 694 F.2d 793, 822 (D.C. Cir. 1982) (citation omitted); *see Catholic Healthcare W. v.*

*Sebelius*, 919 F. Supp. 2d 34, 39 (D.D.C. 2013). In determining whether substantial evidence

exists, the court must take into account "whatever in the record fairly detracts from its weight."

*AT&T Corp. v. FCC,* 86 F.3d 242, 247 (D.C. Cir. 1996) (citation omitted). Courts have framed

the substantial evidence and arbitrary and capricious standards as overlapping, with the substantial evidence standard entailing judicial scrutiny at least as rigorous as the arbitrary and capricious standard. *See, e.g.*, *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 684-86 (D.C. Cir. 1984) (Scalia, J.) ("[T]he distinction between the substantial evidence test and the arbitrary or capricious test is 'largely semantic.'" (citation omitted)).

66.     As an initial matter, the Deputy Administrator's decision unreasonably ignored the plain language of the regulation that indisputably governs apportionment.   The Deputy Administrator failed to acknowledge that the regulation that undisputedly governs apportionment of the claims at issue (section 417.560(c)) ties apportionment not to the cost that a plan pays to the provider, but rather "the ratio of **charges** for covered services . . . ."  42 C.F.R. § 417.560(c) (emphasis added).  The simple fact is that the regulation establishes the method for apportioning an HMO's costs, and by selectively excluding certain charges for services to Medicare patients, CMS is upsetting the balance and averaging principles on which the cost finding and cost apportionment calculations rely.  *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 798–99 (D.C. Cir. 1984) (discussing CMS's longstanding position that, while particular expenses might be allocated disproportionately to or from the Medicare program, "there will be other costs disproportionately allocated in the other direction which will compensate for the first cost") (citation omitted); *Charter Peachford*, 803 F.2d at 1547 (explaining that Medicare reasonable cost principals employ an "averaging technique" and inconsistent treatment of statistics used in these proxies "would destroy the balance upon which the regulatory averaging principal depends . . .").

67.     Instead of engaging with the plain language of section 417.560(c), the Deputy Administrator relies on an inapposite regulation, section 417.556, to support his decision.  That regulation governs apportionment for *provider* services (such as those of a hospital), while the

claims at issue here involve *physician and supplier* services (which are governed by section 417.560).  *See* 42 U.S.C. § 1395x(d), (u) (defining "provider" and "supplier"); 42 C.F.R. § 400.202 (defining "supplier" to mean "a physician or other practitioner, or an entity other than a provider, that furnishes health care services under Medicare"; and defining "provider" to mean, among other things, a hospital, skilled nursing facility, home health agency, rehabilitation agency, and other facilities not at issue here).  And, while apportionment for provider services under section 417.556 is "based on the cost the HMO or CMP pays the provider," apportionment for physician and supplier services under section 417.560 contains no such requirement.  *Compare* 42 C.F.R. § 417.556, *with* 42 C.F.R. § 417.560(c).

68.    The Deputy Administrator's decision is also arbitrary and capricious in that it fails even to acknowledge that the agency has changed its position governing treatment of the newly excluded claims, much less offered a good reason for that change.  The Deputy Administrator asserts that the revisions to the 2013 cost report instructions merely clarified the "longstanding practice of removing carrier paid claims from the apportionment ratio."  Administrator Decision at 18.  This assertion itself is inconsistent with CMS's prior arguments on this point, which argued that the cost report instructions made explicit CMS's "policy" on the excluded claims but never that CMS had a longstanding "practice" of removing these claims.  In addition, this unsupported "finding" of a longstanding practice flies in the face of the evidence before the agency, namely CMS's decades-long historical policy and practice of approving cost reports, after extensive audits, that *included* the claims at issue in the apportionment statistics.  But, whatever CMS may assert about its (unwritten and unenforced) policy about carrier paid claims, there can be no dispute that CMS's historical practice had been to allow inclusion of the claims at issue in the apportionment

statistics. *See Rocky Mountain,* 384 F. Supp. 3d at 85 (Until CMS "broke its silence in 2013," the agency "had never objected to [the plan's] inclusion of carrier-paid claims in its cost reports.").

69.    Further adding to the arbitrary and capricious nature of the agency action here is the repeated failure to take into consideration serious reliance interests engendered by CMS's longstanding policy and practice. The Plan had no reason to believe that its apportionment method were unacceptable. To the contrary, communication with CMS affirmed the Plan's understanding that the claims at issue were to be included in the apportionment statistics. Scott & White had to submit its budget forecast for the 2013 cost year nearly a year before the revised instructions were transmitted to HMOs, and had relied on the plain language of the regulations and longstanding practice and instructions of CMS in contracting with physicians and suppliers, in creating its budget forecast, and in operating throughout the 2013 cost year. The Deputy Administrator's decision does not even mention, much less consider, the reliance interests of Scott & White and all other HMOs in CMS's longstanding treatment of the types of claims excluded here.

70.    CMS's position on when the new policy took effect and to which cost years it could be applied is also inconsistent, a hallmark of arbitrary and capricious action. Given CMS's longstanding policy and practice with respect to the claims excluded here and the significant reliance interests engendered by such, it makes sense that the 2013 Memorandum transmitting the revised instructions and cost report forms notes that those are "to be used beginning with the 2014 Budget Forecast." In briefing at the administrative level in this matter, CMS itself *agreed* that "[p]lans were required to use the new forms starting with their FY 2014 cost year"—*after* the 2012 and 2013 cost years at issue here. Hearing Officer Decision at 15. Yet the Deputy Administrator, without explanation or acknowledging this prior admission by CMS, required removal of carrier-paid claims from the apportionment ratio for both the 2012 and 2013 cost years. In other words,

there is *no* connection, much less a rational connection, between the conceded fact that the new instructions did not apply before the 2014 cost year and the decision to apply those changed instructions to the 2012 and 2013 cost years. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

71.     The Deputy Administrator also makes the unsupported assertion that "[g]enerally, in the Medicare program, when an entity furnishes a service it means the entity incurred the cost. Similarly a 'charge' is associated with incurred costs that includes the payment." Administrator Decision at 15 n.17. This is consistent with CMS's further admission later in the Deputy Administrator's decision that "CMS recognizes the Plan may have incurred unidentified costs related to the arrangement of these services, which is not captured if the non-paid service is not included in the statistic[s]." *Id.* at 17. But the Deputy Administrator's additional effort here to blur the lines of costs, charges, and payments and discount the costs that CMS admits Scott & White has incurred defies common sense.

72.     Indeed, looking specifically at the cost report instructions in play here shows the impropriety of trying to conflate these concepts: the instructions explicitly require the reporting of statistics for covered services for which the Plan has not yet paid or for which the Plan may not pay the full amount. For instance, the instructions state that the total service statistics reported in column 4 of Worksheet D "should include all of the days used whether or not the plan has been billed by the provider due to timing delays." Likewise, the instructions require the Plan to include in the apportionment calculation some services for which the Plan may pay less than the full fee schedule amount—including when an employer-sponsored plan is the primary payer, leaving the Plan with only some residual liability. Contrary to the Deputy Administrator's conclusions, the agency's instructions require reporting services in the apportionment statistics regardless of payment level. While the Administrator attempts to blur the lines between apportionment and

costs by claiming that inclusion of carrier-paid claims in the apportionment statistics results in "excess payment by the Medicare program," there is no dispute that Scott & White incurred costs associated with these claims, including residual payment amounts and administrative and processing costs, and that Scott & White's reported costs include only those incurred by Scott & White.  No matter how this cost pool is divided, it cannot possibly produce a result in which Scott & White is reimbursed for costs it did not incur.

73.    Furthermore, CMS's attempt to change its standards to require plans to exclude certain charges from their apportionment statistics (despite no provision of the regulation allowing CMS to exclude these or any charges), is invalid because it was not adopted in observance of procedure required by law.  *See* 5 U.S.C. §§ 553, 706; 42 U.S.C. § 1395hh(a)(2).  The Medicare Act explicitly requires that the agency go through notice-and-comment rulemaking for *any* "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing . . . payment for services" under the Medicare Act.  *See* 42 U.S.C. § 1395hh(a)(2); *Allina Health Servs. v. Price*, 863 F.3d 937, 943 (D.C. Cir. 2017) ("*Allina II*") (ruling that the Medicare Act does not incorporate the APA's exceptions to notice-and-comment rulemaking and requires the Secretary to invoke notice-and-comment rulemaking for any "requirement" that establishes or change a binding standard that "define[s] the scope of hospitals' legal rights to payment"), *aff'd sub nom. Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1810–14 (2019).  Furthermore, HHS cannot circumvent § 1395hh's notice-and-comment requirement "by claiming that it was acting by way of adjudication rather than rulemaking."  *Allina II*, 863 F.3d at 945.  Beyond the Medicare Act, the APA further requires notice-and-comment rulemaking when an agency attempts to change a substantive rule.  *See* 5 U.S.C. § 553; *Am. Fed'n of Gov't Emps. v.*

*Fed. Labor Rels. Auth.*, 777 F.2d at 759 (D.C. Cir. 1985) ("[U]nless and until [an agency] amends or repeals a valid legislative rule or regulation, [the] agency is bound by such a rule or regulation.").

74.     The changed policy in the 2013 Memorandum and subsequent determination to exclude the claims at issue here in the Plan's cost reports for years prior to that determination did not undergo proper notice-and-comment rulemaking, as required by the Medicare Act and the APA. CMS's determination to alter the apportionment statistics here is, at the minimum, a substantive statement of policy "le[tting] the public know [the agency's] current . . . adjudicatory approach" to calculating payments to HMOs. *Allina II*, 139 S. Ct. at 1810. Thus, as the Supreme Court required notice and comment for establishing a new policy with respect to the Medicare fraction in *Allina*, notice and comment was required here before CMS could enact a policy excluding the claims at issue from the apportionment statistics. The hearing officer refused to enforce the notice-and-comment requirements in the Medicare Act as "beyond the Hearing Officer's scope of authority," despite the fact that the regulations governing the hearing officer's review indisputably require the hearing officer to "comply with all the provisions of Title XVIII of the Act and regulations issued thereunder." 42 C.F.R. § 405.1867. While the Deputy Administrator acknowledged the hearing officer's conclusions with respect to *Allina*, the Deputy Administrator did not consider whether the Medicare Act's heightened notice-and-comment requirements or *Allina* applied to the changed policy and practice with respect to the excluded claims.

75.     Scott & White also did not have notice, with the ascertainable certainty that due process requires, that its apportionment statistics could not include Medicare-covered services for which a claim was processed by a carrier. Scott & White reasonably relied on the apportionment regulation, rules in effect during the periods at issue, and its own communications with CMS and had no notice of the policy view that CMS applied retroactively in this case. *Gen. Elec. Co. v.*

*EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) ("*Gen. Elec. I*"); *see also Loma Linda Univ. Med. Ctr. v. Sebelius*, 408 F. App'x 383 (D.C. Cir. 2010) (*per curiam*) (affirming the Court's reversal of Medicare reimbursement denial where the appellee hospital "did not receive notice 'with "ascertainable certainty"'") (quoting *Gen. Elec. I*, 53 F.3d at 1329); *Hosp. of the Univ. of Pa. v. Sebelius*, 847 F. Supp. 2d 125, 135–42 (D.D.C. 2012) (reversing a denial of Medicare payment due to lack of fair notice of the agency's interpretation of its regulations); *Grancare, Inc. v. Shalala*, 93 F. Supp. 2d 24, 31–34 (D.D.C. 2000) (reversing the Secretary's disallowance of Medicare reimbursement because the agency did not afford affected skilled nursing facilities fair notice of the agency's interpretation of its rules). And the obligation to provide "clear notice" is "especially acute" when, as here, the interpretation of a regulation is contracted by the plain language of that regulation. *Hosp. of the Univ. of Pa.*, 847 F. Supp. 2d at 142; *see also id.* at 135–36 (explaining that "the obligation on the agency to provide adequate notice is at its peak, because a reasonable reader of the regulations could quite naturally reach a conclusion contrary to that reached by the agency").

76.     Even when notice-and-comment rulemaking is not required, CMS may not rely upon an unpublished standard to support a retroactive disallowance of Medicare cost reimbursement. *See Chippewa Dialysis Servs. v. Leavitt*, 511 F.3d 172, 176–77 (D.C. Cir. 2007) (citing 42 U.S.C. § 1395hh(c)(1) to require Secretary to publish "all manual instructions, interpretive rules, statements of policy, and guidelines of general applicability" in the Federal Register, at least every three months). The Medicare statute explicitly forbids applying a "substantive change in regulations, manual instructions, interpretive rules, statements of policy, or guidelines of general applicability . . . retroactively to items and services furnished before the

effective date of the change" except in limited circumstances enumerated in the statute.  42 U.S.C. § 1395hh(e)(1)(A).

77.    But that is exactly what CMS is attempting to do here—apply the changed policy to services rendered well before the effective date of the policy change.  By the time the changed instruction was transmitted to the HMOs, the 2013 cost year was almost complete so it makes sense that the instruction would not apply until the start of a new cost year cycle with the 2014 Budget Forecast.  Yet, the hearing officer found the effective date to be the date on which the revised instructions were transmitted to HMOs (August 12, 2013), and then proceeded to find that the changed instruction applied to *all* services rendered in the 2013 cost year, including those services already rendered before August 12, 2013.  Such retroactive application to services already rendered and to a cost year that was already reaching its end is prohibited under the Medicare Act.

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff requests an Order:

A.    setting aside and declaring invalid the decision of the Administrator of CMS and to remove carrier-paid claims from Scott & White's service statistics for the 2012 and 2013 cost reporting periods at issue;

B.    remanding this case to the Defendant's agency's hearing officer for further proceedings consistent with this Court's decision, including payment of the additional amounts due to Scott & White plus applicable interest owed on the underpayments to Scott & White for the cost years at issue;

C.    requiring the Secretary to pay legal fees and costs of suit incurred by the Plaintiff; and

D.    providing such other relief as the Court may consider appropriate.

Respectfully submitted,

/s/ *Stephanie A. Webster*
Stephanie A. Webster
(D.C. Bar No. 479524)
Adam R. Safadi
(D.C. Bar No. 241305)
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006-6807
Phone: (202) 508-4859
Fax: (202) 383-9334
Stephanie.Webster@ropesgray.com

*Attorneys for Plaintiff*

Dated: October 19, 2022