**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

SCOTT & WHITE HEALTH PLAN d/b/a
BARYLOR SCOTT & WHITE HEALTH
PLAN,

              Plaintiff,

              v.

XAVIER BECERRA,

              Defendant.

Case No. 22-cv-3202 (CRC)

---

**<u>MEMORANDUM OPINION</u>**

Plaintiff Scott & White Health Plan ("Scott & White" or "the Plan") is a Texas-based

health maintenance organization ("HMO") that furnishes services to Medicare beneficiaries. In

exchange, Medicare reimburses Scott & White on an annualized basis for the share of the Plan's

costs attributable to Medicare patients. When filing its year-end cost reports for 2012 and 2013,

Scott & White tabulated and allocated its total costs to calculate the Medicare-eligible share, in

accordance with 42 C.F.R. § 417.560(c). In mid-2013, however, the Centers for Medicare and

Medicaid Services ("CMS") issued a "[c]orrection" to its cost-tabulation instructions stating that

"carrier-paid claims"—claims billed to and paid by a Medicare administrator or other

intermediary rather than an HMO—should not be considered in the cost apportionment process.

Consistent with this guidance, CMS audited Scott & White and sought to recoup nearly $10

million in past payments. Following an appeal and a decision by a hearing officer, the CMS

Administrator upheld those adjustments.

Scott & White then sued the Secretary of Health & Human Services ("HHS"), contending

that the Administrator's decision was contrary to the controlling regulation, 42 C.F.R.

§ 417.560(c), and otherwise arbitrary and capricious in violation of 5 U.S.C. § 706. Both sides

have moved for summary judgment.  After parsing § 417.560(c)'s text in the relevant context,
the Court agrees that the regulation favors Scott & White.  It accordingly grants the Plan's
motion for summary judgment and denies the Secretary's cross motion.

## I. Background

### A. Legal Background

Medicare is a federally funded health insurance program that provides care to elderly and
disabled individuals.  See 42 U.S.C. § 1395 et seq.  As originally enacted, Medicare was split
into two parts.  Part A covers "the costs of hospital, related post-hospital, home health services,
and hospice care," id. § 1395c, while Part B covers a variety of outpatient "medical and other
health services," id. § 1395k(a)(2)(B).  This case concerns Medicare Part B.[1]

Under a traditional Medicare Part B fee-for-service program, the Government directly
reimburses providers and suppliers for necessary care furnished to Medicare beneficiaries.  Id.
§ 1395l.  Those direct payments are processed by Medicare administrators called "carriers."  See
id. § 1395u.  Since the 1970s, the HHS Secretary also may enter cost-reimbursement contracts
with HMOs, which provide or arrange for the provision of Medicare-covered health services.
See id. § 1395mm.  HMOs, in turn, can either provide covered services directly to patients or
through contractual arrangements with institutional providers, such as hospitals, as well as
physicians and other healthcare suppliers that agree to provide care to the HMO's customers.
See id.  After providing care to Medicare beneficiaries, third-party providers and suppliers are
supposed to bill their HMO partner, which then pays these entities based on pre-specified prices
for each service.  Administrative Record ("AR") at 12.

---

[1] Since its original passage, Congress has expanded Medicare to include "Medicare
Advantage Plans" offered through private companies (Part C) and prescription drug benefits
(Part D).

HMOs, for their part, are entitled by statute to reimbursement for the "reasonable cost[s]" of the covered services that they provide to Medicare beneficiaries.  See 42 U.S.C. § 1395mm(h)(2).  The Medicare Act defines "reasonable cost" as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services."  Id. § 1395x(v)(1)(A).  It further specifies that reasonable costs "shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs."  Id.  These regulations, the Act mandates, shall "take into account both direct and indirect costs" while also avoiding cross-subsidization. Id.  That is, the regulations must ensure that "the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs."  Id.  The mechanism of separating the costs for Medicare patients from those for non-covered patients is commonly known as "apportionment."  Within these broad brushstrokes, the Act grants the Secretary significant authority to color in the details through regulations.  Id.

The process of reimbursing HMOs takes place on an annual basis.  Each contract year, CMS "makes monthly advance payments equivalent to the HMO's . . . interim per capita rate for each beneficiary who is registered in CMS records as a Medicare enrollee of the HMO."  42 C.F.R. § 417.570(a)(1).  The "interim per capita rate is determined annually by CMS on the basis of the HMO's . . . annual operating and enrollment forecast," id. § 417.570(b), which the HMO submits "at least 90 days before the beginning of each contract period," id. § 417.572(a).  Within 180 days of the end of the contract year, an HMO must file a cost report which CMS will use to make retroactive adjustments for the prior year and to calculate advanced payments for the next

one.  See 42 U.S.C. § 1395mm(h)(3)–(4); 42 C.F.R. § 417.576(b)(1), (c)(1).  That year-end

report must detail the HMO's "per capita costs incurred in furnishing covered services to

Medicare enrollees" and explain its "methods of apportioning cost among Medicare enrollees,

and nonenrolled patients," as required by the Act and corresponding regulations to prevent cross-

subsidization.  42 C.F.R. § 417.576(b)(2).  CMS then makes "suitable retroactive corrective

adjustments" if the previous year's advance payments were either "inadequate or excessive," 42

U.S.C. § 1395x(v)(1)(A); see also id. § 1395mm(h)(3) (stating that payments are subject to

"appropriate retroactive corrective adjustment at the end of each contract year so as to assure that

[an] organization is paid for the reasonable cost actually incurred"); 42 C.F.R. § 417.576

(detailing rules for "final settlement" of payments).  These end-of-year payment adjustments

come in the form of a Notice of Program Reimbursement, "which represents CMS'[s]

determination of the reasonable costs owed to the plan for the cost period" and either authorizes

compensation for underpayments or claws back any overpayments.  AR at 11.

   Particularly relevant here, CMS has promulgated regulations setting forth formulas that

HMOs must use when apportioning costs between Medicare and non-Medicare patients in their

year-end reports.  See 42 C.F.R. § 417.552(a) (requiring that plans use "methods approved by

CMS" when apportioning costs).  Those formulas differ depending on whether the service was

furnished by a "provider" (such as a hospital) or by a "supplier" (such as a physician).[2]  See id.

§ 417.556 (provider apportionment formula); Id. § 417.560 (supplier apportionment formula).

The regulation at the center of this case, 42 C.F.R. § 417.560(c), defines the process of allocating

---

[2]  The Medicare Act defines "providers" to include "a hospital, critical access hospital, rural emergency hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, [or] hospice program."  42 U.S.C. § 1395x(d).  It defines "suppliers" as "a physician or other practitioner, a facility, or other entity (other than a provider of services) that furnishes items or services under this subchapter."  Id. § 1395x(u).

the reasonable costs of *supplier*-furnished services between Medicare and non-Medicare patients as follows:

> *Medical services furnished under an arrangement that provides for the HMO or CMP to pay on a fee-for-service basis.* The Medicare share of the cost of Part B physician and supplier services furnished to Medicare enrollees under arrangements, and paid for by the HMO or CMP on a fee-for-service basis, is determined by multiplying the total amount for all such services by the ratio of charges for covered services furnished to Medicare enrollees to the total charges for all such services.[3]

Under this regulation, rather than tallying up HMOs' costs for physician services attributable to Medicare enrollees, HMOs use a "statistical proxy formula" to apportion costs that the plan "actually incurred" between Medicare enrollees and non-Medicare enrollees. AR at 13. HMOs first calculate all direct costs associated with furnishing a service to Medicare and non-Medicare enrollees as well as the indirect costs not tied to particular services—such as accounting, facility, and processing expenses. AR at 10–11. That base figure is then multiplied by "a statistical ratio that represents the Medicare program's share of utilization (numerator) out of a larger set of the organization total utilization (denominator)." AR at 13; see also Rocky Mountain Health Maint. Org., Inc. v. Azar, 384 F. Supp. 3d 80, 84 (D.D.C. 2019) (describing the apportionment process as multiplying the base figure of all direct and indirect costs incurred "by the ratio of charges for covered services furnished to Medicare enrollees relative to the total charges for all covered services").

To assist HMOs in complying with this apportionment process, CMS has published budget forecast worksheets and cost report instructions. See Mot. for Summ. J. ("MSJ") at 8. The instructions for Worksheet E direct HMOs to total "the cost of services incurred by the plan"

---

[3] Another regulation—42 C.F.R. § 417.556—defines the formula for the reasonable cost of *provider* services. This regulation is discussed more below.

and furnished by suppliers.  AR at 1169–70.  HMOs are then told to import these cost figures

into Worksheet K to allocate those costs between Medicare enrollees and other patients using

apportionment statistics calculated in Worksheet D.  See id. at 1164–68 (instructions for

Worksheet D); id. at 1180–81 (instructions for Worksheet K).  During the period at issue, the

Worksheet D instructions advised HMOs to report "the number of days or statistical units used

by Medicare enrollees for which Medicare has primary liability and the days or statistical units

that are covered by the Medicare program."  Id. at 1165–66.  These figures form the basis for the

numerator of the apportionment ratio described above.

In short, the Medicare Part B fee-for-service program is supposed to work as follows:

Third-party suppliers that have furnished care to Medicare patients bill the HMO for the cost of

services rendered.  The HMO pays these suppliers out of the monthly advances that it receives

from the Government.  At the end of each contract year, the HMO tallies up all of the direct and

indirect costs that it actually incurred during the prior year and allocates those costs between

Medicare and non-Medicare patients pursuant to the proscribed apportionment formula, with the

aid of the agency-provided worksheets.  CMS then uses these cost reports to make any "suitable

retroactive corrective adjustments" to the prior year's payments if an HMO's reimbursements

were "inadequate or excessive," 42 U.S.C. § 1395x(v)(1)(A), and to project next year's payment

schedule.  Simple enough.

But in life—and especially in healthcare—things are never quite so simple.  Physicians

and other suppliers sometimes erroneously bill and receive payment directly from the Medicare

carriers rather than going through the HMO.  AR at 9; see also Cross Mot. Summ. J. ("Cross

MSJ") at 1–5, 9–10.  This occurrence is commonly referred to as "carrier-paid claims."  AR 78–

79.  The core issue in this case is whether HMOs may properly include the cost of these carrier-

paid claims in the numerator of the apportionment ratio when calculating the Medicare share of their incurred costs.

B. Factual and Procedural Background

Scott & White is a cost-reimbursed HMO that operates in Texas and covers healthcare for approximately 400,000 people.  Compl. ¶ 10.  It maintains that, for decades, CMS permitted HMOs to include carrier-paid claims in the numerator of their cost apportionment formulas.  Consistent with this purported long-standing practice, Scott & White entered all relevant carrier-paid claims in its Worksheet D calculations for its 2012 cost report to calculate its apportionment ratio.  It did not, however, include any payments made by Medicare carriers for beneficiaries enrolled in the Plan on its Worksheet E calculations of its costs because it did not actually incur these expenses.  MSJ at 12–13.  Thus, the Plan's 2012 cost report generated the Medicare-share of its supplier costs by taking a base figure that included direct and indirect costs that the Plan actually paid out (excluding any carrier-paid claims) and multiplying that base figure by an apportionment ratio that included carrier-paid claims—just as the Plan asserts HMOs always had done.

But things changed in August 2013 when CMS issued a memorandum with new instructions for Worksheet D stating:  "Correction: Please note that for the completion of this worksheet, Medicare statistics should exclude any claims processed by MACS, Carriers, and Intermediaries."  AR at 106–07.  The email transmitting this memorandum advised that the updated worksheet instructions were "to be used beginning with the 2014 Budget Forecast."  AR at 104–05.  Perhaps believing that this new guidance did not affect its cost reports for the current year, Scott & White followed its standard practice in its 2013 cost report and included carrier-paid claims in its Worksheet D apportionment ratio.

After Scott & White submitted its 2012 and 2013 cost reports, CMS contracted with an independent accounting firm to audit the cost reports using CMS-specified audit protocols.  See Cross MSJ at 10.  The auditor determined that Scott & White had improperly included the charges associated with carrier-paid claims in its apportionment ratio.  Id. at 11.  Specifically, it found that Scott & White's apportionment ratio wrongly contained charges where the carriers had "paid the Medicare primary share of the allowable fee-for-service amount" and the Plan had paid only "the remaining balance beneficiary-owed amount."  Id. (citations omitted).  After removing those charges from the ratio, the auditor determined that Scott & White owed approximately $10 million—$4,507,393 for 2012 and $5,070,813 for 2013—and CMS sought adjustments for that amount.  AR at 1292.

Scott & White timely appealed this payment determination to a CMS hearing officer.  See 42 C.F.R. §§ 417.576(d)(4), 405.1801(b)(2).  The hearing officer issued a split-decision in the appeal, reversing the adjustments for 2012 but upholding the adjustments to remove these services from the apportionment statistics for 2013.  See AR at 76–100.  With respect to the 2012 adjustments, the hearing officer agreed with another hearing officer's prior determination in Rocky Mountain Health Maintenance Org. v. CMS, Hearing Officer Case No. HMO 2014-2 (Sept. 22, 2016) (AR at 327–36), that a "literal reading of 42 C.F.R. § 417.560(c) dictates that carrier paid claims are included in the apportionment methodology."  AR at 88, 331.  Absent "additional controlling sub-regulatory guidance," the hearing officer in Scott & White's case determined that the literal reading controls and, on that basis, overturned the agency's claw backs for the 2012 cost year.  Id. at 88 (citation omitted).  Turning to the 2013 adjustments, the hearing officer noted that CMS had issued such sub-regulatory guidance in August 2013 when it disseminated the revised Worksheet D instructions stating that "Medicare statistics should

exclude any claims processed by" carriers.  Id. at 91.  Although the email transmitting the instructions had indicated that they were operative starting in 2014, the hearing officer determined that they kicked into effect for the 2013 cost reporting period.  Id. at 93.  She thus upheld the 2013 downward adjustment of over $5 million on this basis.  Id. at 94.  In doing so, the hearing officer declined to consider the Plan's argument that this new guidance, which it contended had changed prior policy, was invalid for failure to comply with the Medicare Act's notice-and-comment requirements, insisting that such arguments were "beyond [her] scope of authority."  Id. at 88–90.

One week later, the CMS Administrator exercised his statutory authority to review the hearing officer's decision on his own motion.  See 42 C.F.R. § 405.1875(c)(3)(i); AR at 73–74. In his August 2022 decision, the Administrator affirmed the hearing officer's decision to uphold the 2013 adjustments but reversed the 2012 determination and re-imposed the claw back for that year.  AR at 4–22.  The Administrator concluded that, under the Medicare Act and the regulations in place during 2012 and 2013, Scott & White was not permitted to include carrier-paid claims in the apportionment ratio because doing so would violate the Medicare Act's prohibition on cross-subsidization by requiring the Government to pay once again for costs that its carriers had already funded, thereby allowing the Plan to double dip into the federal coffers. AR at 18–21.  When citing to the regulations for support, however, the Administrator crossed wires.  Although some portions of the decision discussing the case's procedural history and the parties' arguments referred to the relevant regulation governing *supplier* services, see AR at 4–17 (citing 42 C.F.R. § 417.560(c)), the analysis portion repeatedly cited and quoted the separate regulation governing apportionment of *provider* services, see AR at 18–20 (citing 42 C.F.R. § 417.556)).  This provider regulation, unlike § 417.560(c) at issue here, explicitly states that the

"Medicare share must be based on the *cost the HMO or CMP pays* the provider under their arrangement"—language that the Administrator pointed to as conclusive evidence that HMOs cannot include carrier-paid claims in their apportionment ratio.  42 C.F.R. § 417.556(a) (emphasis added).  The Administrator acknowledged that "the Plan may have incurred unidentified costs related to the arrangement of [carrier-paid] services, which [are] not captured if the non-paid service is not included in the statistic," but he resolved that including these carrier-paid charges "distorts the apportionment ratio" because Medicare already had funded these services.  AR at 20.

Scott & White now appeals the Administrator's final decision to this Court under the Administrative Procedure Act ("APA"), 60 Stat. 237, as amended, 5 U.S.C. § 500 et seq.  The Plan contends that the Administrator's removal of carrier-paid claims from the apportionment ratio is contrary to law because 42 C.F.R. § 417.560(c) clearly requires Scott & White to report all charges, even those that carriers fund, in the ratio.  Even if the regulation is ambiguous on this point, the Plan asserts that the agency's contrary interpretation deserves no deference because the Administrator relied on the wrong regulation, failed to acknowledge that CMS was changing its longstanding policy regarding carrier-paid claims, and ignored the Plan's reliance interests.  For similar reasons, the Plan contends that the agency's decision was arbitrary and capricious.  Last, the Plan maintains that CMS's alleged new approach to carrier-paid claims must be adopted through notice-and-comment rulemaking under the Medicare Act, which CMS failed to follow here.  The Secretary disagrees on all counts and has filed a cross motion for summary judgment.

## II.   Legal Standards

When evaluating cross motions for summary judgment under the APA, "the Rule 56 standard does not apply."  Alfa Int'l Seafood v. Ross, 264 F. Supp. 3d 23, 36 (D.D.C. 2017).

The court instead "sits as an appellate tribunal," and "[t]he entire case on review is a question of law." Id. (quoting Am. Biosci., Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).  In doing so, the court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, id. § 706(2)(C), or "without observance of procedure required by law," id. § 706(2)(D).

An agency action is arbitrary and capricious if an agency fails to "comply with its own regulations."  Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA, 752 F.3d 999, 1009 (D.C. Cir. 2014) (cleaned up).  Under the practice of Auer deference, see Auer v. Robbins, 519 U.S. 452 (1997), a court typically will "defer to an agency's interpretation of its own regulation if the regulation in question is 'genuinely ambiguous' and if the agency's reading is reasonable," Doe v. SEC, 28 F.4th 1306, 1311 (D.C. Cir. 2022) (quoting Kisor v. Wilkie, 139 S. Ct. 2400, 2415–16 (2019).  That is especially true in Medicare cases where the "tremendous complexity of the Medicare statute . . . adds to the deference which is due to the Secretary's decision."  Dist. Hosp. Partners, L.P. v. Burwell, 786 F.3d 46, 60 (D.C. Cir. 2015).  At the same time, however, the Supreme Court has made clear that deference is not appropriate in every case.  Kisor, 139 S. Ct. at 2414.  In particular, Auer deference is not appropriate unless "(1) the relevant regulation is the agency's own regulation; (2) it is genuinely ambiguous; (3) the interpretation meets the factors that make it the agency's official and legitimate position; and (4) the agency's reading is reasonable."  Ovintiv USA, Inc. v. Haaland, No. 21-cv-2552-RCL, 2023 WL 2708821, at *10 (D.D.C. Mar. 30, 2023) (citing Doe, 28 F.4th at 1311).

III.  **Analysis**

The Administrator's decision to uphold the downward adjustments to the Plan's 2012 and 2013 cost reports violated 5 U.S.C. § 706(2)(A) because that decision was based on a misreading of 42 C.F.R. § 417.560(c)'s plain language.  Even if the Administrator's contrary interpretation were correct, his decision in this case would nonetheless be arbitrary and capricious because the Administrator failed to adequately justify CMS's change in policy or to account for the Plan's reliance interests.  For both these reasons, the Court awards summary judgment to Scott & White and remands this matter to the agency for further proceedings consistent with this opinion.

A.  <u>Contrary to Law</u>

The crux of the dispute here is whether Scott & White can include carrier-paid claims in its apportionment ratio when allocating the total costs for the covered services that its suppliers provided between Medicare and non-Medicare patients to calculate the Government's share of its costs.  A straightforward reading of 42 C.F.R. § 417.560(c) reveals that it may.  Given that the controlling regulation is clear on the matter, the Court finds no reason to defer to the agency's contrary interpretation.  But even if reasonable minds could differ on § 417.560(c)'s meaning, the Court would still find that <u>Auer</u> deference is not warranted based on the multiple flaws in the Administrator's analysis.  See <u>Kisor</u>, 139 S. Ct. at 2416 ("[N]ot every reasonable agency reading of a genuinely ambiguous rule should receive <u>Auer</u> deference.").  The Court therefore concludes that agency's adjustments ran afoul of 5 U.S.C. § 706(2)(A) because they conflict with the best reading of the on-point regulation.

1.  *Interpretation of the Regulation*

To begin, the Administrator's decision must be set aside because it is clearly contrary to 42 C.F.R. § 417.560(c)'s plain language.  See <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504,

512 (1994) (holding that a court cannot accept an agency's interpretation that is contrary to "the regulation's plain language or [to] other indications of the [agency's] intent at the time of the regulation's promulgation" (citation omitted)).

The parties in this case read this supplier cost-apportionment regulation differently.  Scott & White contends that the regulation instructs HMOs to calculate the Medicare-eligible share of incurred costs by taking the total (direct and indirect) incurred costs for all services furnished by suppliers and then multiplying that base figure by an apportionment ratio with a numerator that includes all charges for covered services to Medicare enrollees (whether or not the Plan incurred any cost for the service) and a denominator that contains all charges for covered services to both Medicare and non-Medicare enrollees (again, regardless of who paid the bill).  Thus, under the Plan's interpretation, 42 C.F.R. § 417.560(c) allocates costs based on the following formula:

$$\text{Medicare Share of Incurred Costs} = \text{Total Incurred Costs for All Services} \times \frac{\text{Charges for Covered Services to Medicare Enrollees (Regardless of Who Actually Pays)}}{\text{Total Charges for All Covered Services (Regardless of Who Actually Pays)}}$$

See Opp'n to Cross MSJ at 7.

CMS has a different reading.  On its account, the regulation states that the apportionment ratio should include only the "services" that the Plan "paid for."  Cross MSJ at 14–15 (quoting 42 C.F.R. § 417.560(c)).  It thus maintains the apportionment ratio—the final part of the formula above—should be revised to include in the numerator and denominator only charges for covered services billed to and actually covered by an HMO.  See id. at 10.

To determine which of these conflicting interpretations is the right one, let's return to the regulation's text. The hearing officer in the earlier <u>Rocky Mountain</u> litigation on this same issue usefully broke down § 417.560(c) into its component parts:

> *Medical services furnished under an arrangement that provides for the HMO or CMP to pay on a fee-for-service basis.* The Medicare share of the cost of Part B physician and supplier services "[1] furnished" to Medicare enrollees under arrangements, "[2] and paid for" by the HMO or CMP on a fee-for-service basis, "[3] is determined by" multiplying the total amount for all "[4] such services" by the ratio of charges for "[5] covered services" "[6] furnished" to Medicare enrollees to the "[7] total charges" for all "[8] such" services.

<u>See</u> AR at 332. As the <u>Rocky Mountain</u> hearing officer explained, the stated purpose of this regulation is to calculate the Medicare share of expenses for all services that are both [1] "furnished" and [2] "paid for" by an HMO but provided through its suppliers. This sum [3] "is determined" through the following process. The HMO first calculates its base figure, which captures the HMO's total costs for all [4] "such services." The term "such services" in this context refers back to the two previously specified requirements: that the services are both [1] "furnished" and [2] "paid for" by the HMO. The regulation then details how to construct the apportionment ratio. The numerator of that ratio includes all [5] "covered services" that are [6] "furnished" to Medicare enrollees. Here, the <u>Rocky Mountain</u> hearing officer noted the meaningful variation that the numerator carries over the "furnished" requirement from earlier in the regulation [1 and 5] while leaving behind the "paid for" requirement [2]. The denominator is then defined as the [7] "total charges" (Medicare and non-Medicare) for all [8] "such" services. The hearing officer found that this reference to "such" services "refers back to the terms in closest proximity [5] and [6] rather than [1] and [2] [which] is mathematically proper as the numerator within a fraction contains a subset of data which resides within the larger denominator." <u>Id.</u>; <u>see also</u> Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation</u>

of Legal Texts 144–46 (2012) (describing the "last-antecedent" rule as the "nearest reasonable-referent" canon).  Stitching together all this analysis, the Rocky Mountain hearing officer concluded that "the literal reading of 42 C.F.R. § 417.560(c) provides that carrier paid claims are included within the apportionment ratio of the numerator and denominator."[4]  AR at 332.  The hearing officer in the present case concurred with this assessment when overturning the agency's 2012 adjustments.  See AR at 88.

The Court also agrees with the Rocky Mountain hearing officer's cogent analysis.  The regulation is clear that the base figure only includes direct and indirect costs for covered services that the HMO both furnished and financed.  Otherwise, the costs would not be actually incurred by the HMO and should not be apportioned in the first place.  But in defining the apportionment ratio used to allocate those costs, the regulation notably omits the "paid for" requirement.  This omission indicates that—unlike the base figure that only includes costs borne by the HMO—this ratio includes *all* charges for furnished services, regardless of which entity picked up the tab.  Scott & White's formulaic rendition of the regulation correctly captures this point.

This interpretation of 42 C.F.R. § 417.560(c) is reinforced by the regulation's alternating use of "costs" to refer to the base figure and "charges" in reference to the apportionment ratio.  While the regulations generally use "costs" when discussing the amount an entity pays out of pocket to deliver a service, see, e.g., 42 C.F.R. § 417.556(a), the word "charges" is defined as the "regular rates for various services that are charged to both beneficiaries and other paying patients who receive the services," see id. § 413.53(b).  Although "charges for services [should] be related to the cost of the services," id., these concepts are not one and the same.  Their difference

---

[4] The district court in this litigation ultimately decided the case on alternative grounds and did not address the merits of this analysis.  See Rocky Mountain, 384 F. Supp. 3d at 88–99.

comes into focus in § 417.560(c)'s careful distinction between calculating costs and apportioning them.  Section 417.560(c) uses the word "costs" to describe the actual direct and indirect expenses that an HMO "paid for" when furnishing services, which are factored into the base figure.  It then shifts to using "charges" to describe the statistical units that make up the apportionment ratio.  These charges, which are determined by fixed rates per service, are not tied to the Plan's out-of-pocket expenses and, accordingly, do not turn on who "paid for" the service.

In addition to its strong textual support, Scott & White's (and multiple hearing officers') interpretation of § 417.560(c) comports with the instructions and worksheets that CMS provided HMOs to calculate their reimbursable costs.  As discussed above, Worksheet E guides the calculation of HMOs' base figure of "total costs of the plan incurred during the reporting period," including administrative and general costs.  AR at 661–65.  Its instructions expressly reference carrier-paid claims when advising HMOs to list "the deductible and coinsurance amounts paid by the plan for those services processed through the MAC/Carrier/Intermediary" so they can "eliminate" those amounts from their cost calculations.  AR at 663.  Worksheet D, meanwhile, specifies the process for calculating "plan statistics" that HMOs use to create the apportionment ratio.  AR at 657–61.  Unlike with Worksheet E, the statistical units tabulated in this worksheet bear little relation to actual expenses as it uses units such as "inpatient days" and "days or statistical units used by Medicare enrollees for which Medicare has primary liability."  AR at 658–59.  Consistent with this observation, until the issuance of the 2013 memorandum, Worksheet D's instructions did not direct HMOs to include only charges that they actually incurred or to exclude carrier-paid claims.  MSJ at 25; AR at 658–59.  These instructions align with the Plan's description of the § 417.560(c) formula.  The base figure is predicated on the HMO's expenses and includes costs the HMO "paid for," excluding carrier-paid claims.  The

apportionment ratio, by contrast, relies on "statistical units" for furnished services that do not turn on payment.

CMS's audit protocols further support this understanding.  Those protocols define "[c]overed [c]harges" as "services or benefits for which the charge is eligible towards satisfying a patient deductible or out of pocket maximum and/or results in the health plan making either partial or full payment."  AR at 284.  This "and/or" definition clearly severs covered charges from incurred costs by making clear that actual payment is not an essential element.  The protocols go on to explain that Medicare's share of costs "is determined by utilizing a ratio representative of the proportion of covered services *furnished* to the Medicare cost based enrollees to the total services furnished [to] all beneficiaries of the Plan."  AR at 285 (emphasis added).  As in the regulation, this recitation of the apportionment ratio incorporates the "furnished" requirement but omits the "paid for" requirement that § 417.560(c) uses when describing the base figure.  The protocols then reiterate that the "statistics utilized to compute the ratio referred to above must represent services actually furnished.  Common statistics used to apportion medical services costs include encounters, visits, services/procedures, relative value units, capitation, physician group, charges, and minutes."  Id.  Here again, the audit protocols include only the "furnished" requirement when describing the ratio and list a series of "statistical units" that are not directly tied to actual expenses—just as the regulation does.

Pushing back against these readings of § 417.560(c), the Secretary urges the Court to zoom out from the text and take a broader perspective.  Most fundamentally, the Secretary insists that interpreting the regulation to permit the inclusion of carrier-paid claims would violate the Medicare Act's central prohibition on cross-subsidization.  See 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 417.576(b)(2).  That restriction ensures that persons not covered by Medicare do not

bear costs for providing services to beneficiaries and, likewise, that CMS does not subsidize care furnished to non-Medicare patients.  Id.  The Secretary contends that permitting HMOs to factor carrier-paid claims into their calculations would breach this core principle by giving HMOs credit for services they never actually funded and that Medicare already financed.  Such "double billing" of carrier-paid claims, the Secretary urges, would overestimate Medicare's share of costs and result in the Government footing the bill for Scott & White's non-Medicare patients (or, alternatively, inflate the Plan's profits).  See Cross MSJ at 17–18, 30.

Although the "double billing" argument has facial appeal, it is important to keep track of where the carrier-paid claims come into the equation.  All sides agree that the base figure—the total costs that the HMO actually paid for in relation to services its suppliers furnished—does not include the costs of services that were paid by Medicare carriers, as those costs were not actually incurred by the Plan.  Id.  There is thus no double dipping in calculating the base figure.  The question is simply how to apportion these actually incurred costs between Medicare and non-Medicare patients.  That is the apportionment ratio's role in this process.[5]  Including carrier-paid claims within this ratio makes sense because doing so allows the Plan to recoup its *indirect* costs that support the provision of services provided to Medicare enrollees.  The regulations specify that these indirect costs—which include facility, record keeping, accounting, and administrative expenses—must be "apportioned to Medicare in accordance with . . . [§] 417.560," the provision at issue here.  42 C.F.R. § 417.564(b)(1).  Indeed, allocating these indirect costs is the entire

---

[5] The distinction between cost-estimation and apportionment is evident in the Code of Federal Regulations' structure.  Sections 417.531–417.550 explain how to calculate allowable, reimbursable costs used to form the base figure.  Sections 417.552–417.564, by contrast, concern apportionment of those costs.  Section 417.560(c) falls within the latter range, and the formula it uses to allocate expenses for supplier-provided services between Medicare and non-Medicare patients employs a ratio based on fixed charges, not incurred costs.

point of going through a complicated apportionment process rather than paying out on a simple "paid claims" basis.  <u>See</u> Cross MSJ at 9 (acknowledging that apportionment is needed because HMOs must be reimbursed for "both the direct and indirect costs").  Many indirect costs stay constant regardless of whether a carrier happens to pay for a particular service.  As a result, HMOs would be undercompensated if they were barred from including such claims in the apportionment ratio.

To be sure, the opposite is also true: inclusion of carrier-paid claims in the apportionment ratio may result in overpayment.  But this only proves the point that the hearing officer in <u>Rocky Mountain</u> noted when writing that the apportionment process relies on a "statistical proxy" that, "by nature, will never achieve an exactly precise measurement."  AR at 333.  Some proxies will favor HMOs, while others will favor the Government.  Under these conditions, it does not suffice to point to the general rule against cross-subsidization (as both sides here do).  We instead need to read the regulation on point, and § 417.560(c) indicates that HMOs can in fact include carrier-paid claims in their apportionment ratio.

The Secretary nonetheless doubles down on his "double payment" argument by insisting that, even if § 417.560(c) contemplates the allocation of indirect costs, Scott & White failed to show that it actually incurred any compensable "administrative and processing" costs associated with carrier-paid claims.  Cross MSJ at 25.  But, as 42 C.F.R. § 417.564(b) demonstrates, the indirect costs that the apportionment ratio seeks to allocate are broader than the administrative and processing costs tied to a given claim.  More fundamentally, the meaning of § 417.560(c) is a general question of law that does not turn on the specific facts of this case.  And if CMS believes that applying § 417.560(c) resulted in overpayment to Scott & White, there were other avenues that the agency possibly could have pursued to rebalance the books.  In particular, the

cost reports may be subject to *case-specific* retroactive adjustment to ensure the Plan is paid an appropriate amount.  See 42 U.S.C. §§ 1395x(v)(l)(A), 1395mm(h)(3); AR at 333.  What the agency cannot do is rewrite the regulation to reach its desired outcome in this case.

Moving further from the relevant regulation, the Secretary points to other provisions to support the principle that HMOs can only be reimbursed for charges that they in fact incurred. None of these rules change the calculus here, however.  First, the Secretary defends the Administrator's reliance on the regulation governing services furnished through *providers*, rather than by *suppliers*, by claiming that these two regulations "impose the same standard, limiting the apportionment ratio to only those claims that an HMO 'paid.'"  Cross MSJ at 16.  But it is hard to see how these two rules set the exact same standard given that the provider regulation does not mention any apportionment ratio based on covered charges, see 42 C.F.R. § 417.556, and that the supplier regulation does not carry over the "paid for" requirement when describing that ratio, see id. § 417.560(c).

The Secretary also cites 42 C.F.R. § 417.532(g)'s general statement that, if an HMO "elects to have CMS pay for provider services" directly, CMS "deducts these payments and any other payments made by the Medicare intermediary or carrier on behalf of the HMO."  That rule sheds little light on the present matter, however, because this provision speaks to the calculation of total costs, and all parties agree that the base figure includes only costs that an HMO incurred. Furthermore, a provision that is entitled "[g]eneral [c]onsiderations" does not control in the face of a more specific regulation governing the apportionment of costs in the supplier context.  See Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 170 (2007) (stating that "normally the specific governs the general"); 42 C.F.R. § 417.536(a) (noting that the regulations' general cost payment principles apply "[u]nless otherwise specified").

In a final effort, the Secretary analogizes to regulations on "discounts" and "allowances" that are deducted from the reasonable cost calculation, see Cross MSJ at 18 (citing 42 C.F.R. § 413.98(a)), and cites to a collection of cases holding that healthcare companies cannot seek Medicare benefits for costs that they either did not shoulder in the first place or for which the organization already received compensation, see, e.g., Abraham Lincoln Mem'l Hosp. v. Sebelius, 698 F.3d 536, 551 (7th Cir. 2012) (holding hospitals could not claim their entire tax amount as costs considering they received direct refunds from the State); Dana-Farber Cancer Inst. v. Hargan, 878 F.3d 336, 345 (D.C. Cir. 2017) (similarly holding that hospitals' total tax costs should account for payments that offset tax liability).  Once more, these provisions and cases all speak to calculating costs.  But Scott & White does not claim that it is entitled to reimbursement for costs it did not incur.  Rather, it seeks to include in its apportionment ratio all services furnished to its members, regardless of whether the direct costs were paid by carriers, so that the Plan can allocate its direct and indirect costs as specified in the controlling regulation.

After examining 42 C.F.R. § 417.560(c) in its proper context, the Court is assured that the regulation permits HMOs to include carrier-paid claims in its apportionment ratio.  Because the § 417.560(c) is unambiguous on this matter, the Court need not defer to the Secretary's contrary interpretation.  See Kisor, 139 S. Ct. at 2414 ("[T]he possibility of deference can arise only if a regulation is genuinely ambiguous . . . even after a court has resorted to all the standard tools of interpretation.").

### 2.  Auer *Deference*

Even if § 417.560(c) were open to interpretation, deference would not be appropriate in this case.  The Supreme Court in Kisor cautioned that "Auer deference is not the answer to every question of interpreting an agency's rules.  Far from it."  139 S. Ct. at 2414.  In addition to the

threshold requirement that the regulation in question be genuinely ambiguous, see id., several other conditions must be met for an agency interpretation to receive Auer deference, see Doe, 28 F.4th at 1311.  Relevant here, "a court may not defer to a new interpretation . . . that creates 'unfair surprise' to regulated parties," such as "when an agency substitutes one view of a rule for another."  Kisor 139 S. Ct. at 2417–18 (quoting Long Island Care, 551 U.S. at 170).  Courts have accordingly "only rarely given Auer deference to an agency construction conflicting with a prior one."  Id. at 2418 (cleaned up) (quoting Thomas Jefferson, 512 U.S. at 515).  This rule has special bite when the new interpretation "upend[s] . . . reliance" interests.  Id.  For these reasons, the Supreme Court in Kisor noted that it recently refused "to defer to an interpretation that would have imposed retroactive liability on parties for longstanding conduct that the agency had never before addressed."  Id. at 2418 (citing Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 155–56 (2012)).  These considerations weigh strongly against deference here because CMS's new interpretation of § 417.560(c), announced in August 2013 and applied retroactively against Scott & White, appears contrary to past agency practice on which Scott & White had relied in preparing for the 2012 and 2013 cost years.

First and foremost, the Secretary's current position likely conflicts with the agency's prior policies and practices.  As discussed above, CMS's worksheet instructions and audit protocols prior to 2013 appear to have allowed HMOs to include all covered charges in their apportionment ratio, regardless of whether the HMO or another entity paid for the service.  Although the Administrator below maintained that these documents never permitted use of carrier-paid claims in the ratio and that the 2013 memorandum merely "clarified CMS'[s] longstanding practice of removing carrier paid claims from the apportionment ratio," AR at 21, the memorandum used to circulate the new instructions tells a different story.  After all, that

memorandum refers to the new guidance as a "[c]orrection" to the prior instructions.  AR at 106.
It would be odd, to say the least, if this "[c]orrection" merely reiterated business as usual.

      But even absent a formal agency policy on the matter, the Court still must evaluate
"whether an agency's new practice is an arbitrary and capricious deviation from prior practice
and precedent."  CSL Plasma, Inc. v. U.S. Customs & Border Prot., 628 F. Supp. 3d 243, 259
(D.D.C. 2022).  CMS appears to have had some practice of permitting HMOs to include carrier-
paid claims in the apportionment ratio.  The hearing officer in the Rocky Mountain case noted
that, from the very moment § 417.560(c) went into effect in 1985, "CMS accepted Rocky
Mountain's cost reports that included apportionment statistics that included carrier paid claims,
even if Rocky Mountain paid nothing or paid only residual amounts."  AR at 329.  It was only
after the 2013 audit that CMS deemed this inclusion erroneous and forbade the practice.  Id.
This may not be decisive evidence of a past practice given that this hearing officer did not find
that the agency had actual knowledge of Rocky Mountain's past inclusions, see id. 329–30 &
n.3, and because, as a subordinate officer, he did not speak for the agency, see, e.g., Comm. Care
Found. v. Thompson, 318 F.3d 219, 227 (D.C. Cir. 2003).  But that was also true in CSL Plasma.
In that case, there was also no direct evidence that the agency was aware of the relevant conduct
prior to its announcement of its new policy.  Yet the court held that the plaintiffs had met their
burden of showing an arbitrary shift in practice both because it "it would be unusual for the
agency" charged with regulating that area to be in the dark and because the agency framed its
new guidance as upending existing operations when stating that it would "*no longer* be
permitted" to cross the border to donate plasma.  628 F. Supp. 3d at 260 (emphasis in original).
It would similarly confound if CMS had no awareness of a multi-decade practice that implicates
millions of dollars in revenue.  This is especially true here considering that CMS's worksheets

specifically addressed carrier-paid claims in the cost-calculation context but did not indicate that these claims should be removed from the statistics reported in the apportionment ratio.[6] And, as in CSL Plasma, CMS presented its new guidance as a "[c]orrection" to the existing worksheets. At the very least, it appears that CMS had never actively forbidden the inclusion of carrier-based claims in the apportionment ratio prior to 2013. And as the Supreme Court has stated, "where, as here, an agency's announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is acute." Christopher, 567 U.S. at 158.

Second, and relatedly, HMOs had significant reliance interests in CMS's prior practices. While the record does not indicate just how long Scott & White reported carrier-paid claims in its apportionment ratio, the Plan submitted budget forecasts ahead of 2012 and 2013 assuming it could do so and later filed cost reports at the conclusion of those years incorporating these sums. MSJ at 34. This inclusion was no mere rounding error, as it swung the Plan's revenue figures to the tune of ten million dollars. The Plan very likely banked on that revenue when planning for future years and structuring its business. To demand that the Plan refund the money years later based on an interpretation of § 417.560(c) that conflicts with the best reading of the regulation and with CMS's own worksheet instructions and audit protocols risks the sort of "unfair surprise to regulated parties" the Supreme Court has counseled against. Kisor, 139 S. Ct. at 2418 (citation and quotation marks omitted).

---

[6] Although the Court does not place much weight on the factor, it also notes that a CMS auditor responded to Scott & White's inquiry about its reports by advising that the Plan should "prepare [its] cost report as noted in the future." AR at 272. As the Secretary points out, see Cross MSJ Reply at 18–19, the auditor's response addressed the Plan's treatment of Medicare Secondary Payer ("MSP") claims rather than carrier-paid claims. But it is reasonable to believe that similar principles apply to these two sorts of claims because, in both cases, the HMO does not pay the full cost of the service but seeks to include the charge in its apportionment ratio. See Cross MSJ at 10 (noting the Plan paid the balance on some carrier-paid claim).

Finally, the agency failed to adequately consider these reliance interests when it gave

retroactive effect to its new interpretation and approved the downward adjustments.  This would

be reason enough not to defer to the Secretary's reading of the apportionment regulation, even if

CMS had no prior policy or practice and was simply silent on the matter.  Courts need not show

deference to an agency interpretation that "impose[s] retroactive liability on parties for

longstanding conduct that the agency had never before addressed." Id. at 248.  In such cases,

"the lack of 'fair warning' outweigh[s] the reasons to apply Auer." Id.  CMS failed to give due

weight to these concerns because, as discussed below, the Administrator repeatedly relied on the

incorrect regulation when concluding that the existing rules on the books foreclosed Scott &

White's inclusion of carrier-paid claims—an error that renders the decision at issue here not only

contrary to law but also arbitrary and capricious.  See Circus Circus Casinos, Inc. v. Nat'l Labor

Rels. Bd., 961 F.3d 469, 483 (D.C. Cir. 2020) (refusing to defer to agency action that the Court

found to be arbitrary and capricious).

*      *      *

In sum, under 42 C.F.R. § 417.560(c)'s plain language, HMOs may include carrier-paid

claims in their apportionment ratio to allocate their direct and indirect costs and arrive at

Medicare's share of the bill.  CMS's Administrator was not permitted to deviate from this

regulation in adjudicating Scott & White's adjustments, nor could the agency effectively amend

the Code of Federal Regulations by issuing a memorandum with contradictory guidance.  See

Dialysis Clinic Inc. v. Leavitt, 518 F. Supp. 2d 197, 203 (D.D.C. 2007) ("It is well-settled that

the guidelines cannot 'trump' the language of a regulation when the regulation is clear on its

face."); Allina Health Servs. v. Price (Allina I), 863 F.3d 937, 943 (D.C. Cir. 2017) ("HHS

[cannnot] circumvent [the notice-and-comment] requirement by claiming that it was acting by

25

way of adjudication rather than rulemaking.").  If the agency seeks to rework this apportionment

formula, it must revise the regulation through the Medicare Act's notice-and-comment process as

specified in 42 U.S.C. § 1395hh(a)(2) and further detailed in Allina I, 863 F.3d at 942–43;

accord Vista Hill Found., Inc. v. Heckler, 767 F.2d 556, 566 (9th Cir. 1985) ("[I]f it turns out

that the disadvantages to the Medicare program of continuing to use the present method of cost

allocation outweigh the advantages or that the policies of the act are being frustrated by the use

of that method, we assume the [agency] will amend [its] regulations or be told to do so by the

Congress. . . . In the meantime, the [agency] has no choice but to follow the rules [it] has

adopted.").[7]

B.  Arbitrary and Capricious

Putting aside for the moment that the Administrator's decision misconstrued the on-point

regulation, that decision also must be invalidated because the Administrator not only failed to

explain CMS's apparent change in policy or practice but also repeatedly relied on the wrong

regulation when rendering his decision.  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm

Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (holding that agency action is "arbitrary and

capricious if the agency has relied on factors which [it was not meant] to consider [or] entirely

failed to consider an important aspect of the problem").  This mistake was far from harmless as it

---

[7] The Secretary's argument that the agency already went through the notice-and-comment process when issuing the 2013 memorandum is unpersuasive for two reasons.  See Cross MSJ at 30.  First, guidance documents—even those issued through notice and comment—cannot trump regulations.  See Ne. Hosp. Corp. v. Sebelius, 657 F.3d 1, 14 (D.C. Cir. 2011).  In revising the formula, the agency must follow the proper order of operations.  Second, the terse statement that the agency intends to "clarify certain instructions, and update outdated issues within the Cost Report" did not provide reasonable notice it would revise § 417.560(c).  78 Fed. Reg. 6331, 6332 (Jan. 30, 2013); see also CSX Transp., Inc. v. Surface Transp. Bd., 584 F.3d 1076, 1080 (D.C. Cir. 2009) (a final rule is not a logical outgrowth of a proposed rule where "interested parties would have had to divine [the agency's] unspoken thoughts" (citation and quotation marks omitted)).

prevented the Administrator from fairly addressing the significant reliance and anti-retroactivity considerations weighing against the adjustments here.

It has long been black letter law that an "agency must at least display awareness that it is changing position and show that there are good reasons for the new policy." Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221 (2016) (citation and quotation marks omitted). This rule applies whether the agency is deviating from a past policy or merely a prior practice. See Am. Wild Horse Pres. Campaign v. Perdue, 873 F.3d 914, 927 (D.C. Cir. 2017). Here, the Administrator failed even to acknowledge that the agency was diverging from any past policy or practice of permitting the use of carrier-paid claims in the apportionment ratio, let alone explain the reasons for the switch. That failure may be rooted in the fact that, throughout his opinion, the Administrator conflated the relevant regulation for the apportionment of costs related to *supplier* services, 42 C.F.R. § 417.560(c), with a separate regulation governing apportionment for *provider* services, § 417.556.

The Administrator began on the right path by citing § 417.560(c) in the introduction to the decision and circled back to this provision in his concluding remarks. See AR at 4–8, 21. In between the start and finish, however, he veered off course. On the ninth page of the decision, the Administrator quoted § 417.556 in its entirety and described it as the regulation governing the "apportionment for services provided through arrangement (rather than provided directly by the HMO)," glossing over the fact that § 417.556 applies only to provider services. Id. at 12. Although he returned to the relevant regulation in the next paragraph, id. at 12–13, the course correction was short-lived. For "all the claims at issue," he continued, "the regulation and statute present a reimbursement formulation that requires the capture of reasonable Medicare costs." Id. at 18. That regulation, he explained, "prescribes that 'the Medicare share must be based on the

cost the HMO or CMP *pays* the provider.'"  Id.  This quotation is again from the provider, not

the supplier, regulation.  Quoting this wrong regulation once more, the Administrator concluded

that, "by not removing the related 'charges for covered services' paid by the carrier," the Plan's

methodology "result[ed] in costs not incurred by the HMO being included in the determination

of Medicare's share."  Id.  Dropping a footnote, the Administrator reiterated that this calculation

was "directly contrary to the method set forth in the scenario covered at 42 C.F.R. § 417.556(d),"

again relying on the wrong regulation.  Id. 18 n.18.  He then conflated the regulations one last

time when, after stating that "generally Medicare rules and the specific regulation here . . . tie the

apportionment statistic to costs incurred," he commented that "[t]he regulation at 42 C.F.R.

§ 417.556(a) specifies that the 'Medicare share must be based on the cost the HMO or CMP pays

the provider under their arrangement.'"  Id. at 20 (emphasis removed).  Only in the following

sentence did he cite to the correct regulation as "[f]urther" support.  Id.  In short, contrary to the

Secretary's spin, the Administrator did not just cite the wrong rule in passing.  See Cross MSJ at

16–17.  He cited, quoted, and relied on that regulation multiple times in the most important part

of the decision.  This repeated reliance "infect[ed] the agency's analysis" and thus renders the

opinion arbitrary and capricious.  PAM Squared at Texarkana, LLC v. Azar, 436 F. Supp. 3d 52,

59 (D.D.C. 2020).

      CMS's only off ramp is if this error "did not prejudice" the Plan and thus it would "be

senseless to vacate and remand for reconsideration."  See PDK Lab'ys Inc. v. U.S. D.E.A., 362

F.3d 786, 799 (D.C. Cir. 2004).  But prejudice is "not . . . a particularly onerous requirement,"

and it is clearly satisfied in this case.  Jicarilla Apache Nation v. U.S. Dep't of Interior, 613 F.3d

1112, 1121 (D.C. Cir. 2010) (citation omitted).  For starters, the prejudice to the Plan is apparent

from the fact that the provider regulation ties allocation to costs when stating that apportionment

is "based on the cost the HMO or CMP pays the provider," 42 C.F.R. § 417.556(a), while the supplier regulation contains no such statement and does not apportion based on incurred costs, see id. § 417.560(c).  But even assuming that it is possible to read these regulations' different language to require the same apportionment rule, Scott & White was nonetheless prejudiced by the confusion over the controlling regulation because it prevented the Administrator from fairly addressing the Plan's reliance and anti-retroactivity arguments.

As previously discussed, Scott & White had significant reliance interests in preserving the prior understanding of § 417.560(c) given that it had planned and budgeted around revenue figures that were calculated using an apportionment ratio that included carrier-paid claims.  The Administrator hardly engaged with these reliance arguments, likely because he determined that it would be unreasonable to rely on a clearly inaccurate interpretation of the regulations.  See Cross MSJ at 30.  But that line of reasoning only holds up if one is reviewing the provider rule, not the supplier regulation at issue here.  The Secretary's litigation position that the Administrator could not have considered these reliance arguments anyway because the agency cannot be equitably estopped from enforcing the statute and regulation fares no better.  Id. at 31 (citing Alegent Health-Immanuel Med. Ctr. v. Sebelius, 34 F. Supp. 3d 160 (D.D.C. 2014).  First, "the Court may not accept 'post hoc rationalizations for agency actions,'" as the agency's actions can be upheld only "on the basis articulated by the agency itself."  Landmark Hosp. of Salt Lake City v. Azar, 442 F. Supp. 3d 327, 334 (D.D.C. 2020) (quoting State Farm, 463 U.S. at 50).  Second, this new argument misses the mark because, while there may not be a separate equitable estoppel claim against the government, a party is still free to assert its reliance interests before an agency or in an APA action before a court.  See Lyng v. Payne, 476 U.S. 926, 936–37 (1986) ("[W]e

have never suggested that the applicant would be under an obligation to satisfy the requirements of proving an equitable estoppel to obtain the relief specifically available under the APA.").

Reliance arguments are particularly persuasive in this case given that the Administrator's decision applied the agency's newly announced interpretation of § 417.560(c) to claw back funds even though CMS's August 2013 memorandum stated that its "[c]orrection" to the worksheet instructions apply prospectively and the Medicare Act imposes a strong rule against retroactivity. The email transmitting this memorandum stated that the updated instructions were "to be used beginning with the 2014 Budget Forecast."  AR at 104–05.  Had the Administrator homed in on the applicable regulation, which does not state that apportionment is tied to costs, it is possible that the Administrator would have honored this message and held that the new guidance applied to future cost reports but did not justify adjustments to pre-2014 reports.

That possibility appears even more likely considering the Medicare Act's rule against retroactivity, which requires that any "substantive change in regulations, manual instructions, interpretative rules, statements of policy, or guidelines of general applicability . . . shall not be applied . . . retroactively to items and services furnished before the effective date of the change," barring circumstances not present here.  42 U.S.C. § 1395hh(e)(1)(A).  Even if the Administrator believed that § 417.560(c) was susceptible to the agency's interpretation and doubted that there was any prior policy or practice regarding carrier-paid claims, the self-described "[c]orrection" to the worksheet instructions might amount to a substantive change insofar as it clarifies CMS's policy.  See Azar v. Allina Health Servs. (Allina II), 139 S. Ct. 1804, 1817 (2019) (concluding a rule change is "substantive" when "the government establishes or changes an avowedly 'gap'-filling policy").  The Administrator never opined on this matter, however, because he concluded that the wrong regulation conclusively settled the issue.  The Court is ill-positioned to predict

how the Administrator would resolve the matter if it were fairly presented, so it cannot conclude that none of the errors in the decision prejudiced Scott & White.

Thus, in addition to being contrary to law, the Administrator's decision upholding the adjustments must be set aside because it is arbitrary and capricious in a manner that was not harmless to Scott & White.  The matter is therefore remanded to the agency so that it can apply the correct regulation, 42 C.F.R. § 417.560(c), in accordance with the Court's interpretation of that provision.

## IV.  Conclusion

The Court will, accordingly, grant Scott & White's motion for summary judgment and deny the Secretary's cross motion.  A separate Order follows.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: September 19, 2023